GUSTAVUS T. KIRBY, Appellant, *v.* BROWN, WHEELOCK: HARRIS, VOUGHT & CO., INC., Respondent.

First Department, April 11, 1930.

*Hugh S. Williamson* of counsel [*Hiram Thomas* and *Edward A. Craighill, Jr.*, with him on the brief; *Breed, Abbott & Morgan*, attorneys], for the appellant.

*Louis Salant* of counsel [*John A. Kelly* and *Joseph J. Cunningham* with him on the brief; *Masten & Nichols*, attorneys], for the respondent.

McAvoy, J.   Plaintiff had a verdict in this case for $75,000 for damages arising out of the failure of the defendant to make a bid for certain property which plaintiff was anxious to acquire and which he had given directions to defendant's officer to bid upon, but the verdict was set aside and the complaint dismissed by the court after the trial.

The basis of defendant's liability is alleged to be that defendant failed to submit plaintiff's bid for certain real property immediately adjoining other real property owned by plaintiff, which bid, it is alleged, defendant had voluntarily undertaken and agreed to submit.

The action was tried before the court and a jury and decision was reserved on defendant's motion to dismiss.   After the verdict, this motion to set aside was granted and the complaint dismissed. Our view is that moral duty and law alike required defendant to submit a bid for plaintiff and that the failure so to do gave rise to a right of action for damage necessarily resulting.   A *résumé* of the parties' relations follows:  Plaintiff, Kirby, owned a piece of real estate on Fifty-seventh street on the corner of Madison avenue.   The plot ran the entire width of the block along Madison avenue, and ran one hundred and twenty-five feet on East Fifty-sixth street and seventy-five feet on Fifty-seventh street.   This was the state of the plot ownership in January, 1926.

Immediately adjoining this property there were two lots, Nos. 32 and 34 East Fifty-seventh street, occupied by Miss Chapin's school.   This lot had a frontage of 50 feet and a depth of 100 feet.   This plot, added to the plaintiff's property, would have made a rectangular plot of 125 feet on each side street and 200 feet along Madison avenue.   The advantages in utilization and enhancement in value of the plot were obvious even to the non-experienced in land sales or usage.

In November, 1925, one Vought, of the firm of Brown, Wheelock: Harris, Vought & Co., who was vice-president of the company and manager of its uptown office, came to plaintiff with a friend named Halsey, a real estate broker, about the sale of Miss Chapin's school

property. This was in the hands of three trustees. Vought had started the negotiations through Charles Brown, Jr., a director of his company, who learned from a Mr. Roosevelt, one of the Chapin school trustees, that the Chapin school property was for sale.

It was suggested to Kirby that the purchase of the Chapin school property would greatly enhance the value of his property if he could make his land square, and Kirby agreed, and stated that he would be willing to pay much more than any one else to get it. The Chapin school had rented two floors of the building adjoining at 36 East Fifty-seventh street, so as to have more facilities. The lease on these floors of that building expired just about the beginning of 1926, and it was necessary, if the school was to remain where it was, to continue to use the space next door so as to carry on the functions of the school. The school wished to remain in Nos. 32 and 34 and to continue the use of the space next door on which the lease would expire shortly, after the proposed sale of the property, pending the selection of a new site and the building thereon of a new school plant.

In November the trustees were approached, after Vought's conference with Kirby, and were told of the fact that Kirby had been a good neighbor of the school; that his daughter had attended there, and Kirby had done the school various favors, and that, if the trustees would be in a position to receive bids, Kirby was ready to make one. It was stated to Vought at that time that the school was not ready to sell, but when it was, it would not do so without giving Kirby a chance to meet any bids or offers they might have for the property; that they would be glad to submit the matter of the sale to Kirby as a neighbor and with the feeling that he above most others was entitled to an opportunity to bid.

During November and December various conversations were had between Halsey and Brown, and between Halsey and Vought, with respect to the attitude of the trustees regarding the sale of the property.

On January 13, 1926, George E. Roosevelt, chairman of the trustees, wrote a letter to Charles Brown, Jr., to whom he had previously talked about the likelihood of selling to Kirby. This letter detailed the terms on which the school would be willing to sell, and thereafter Halsey gave the letter to Kirby.

At a conference between Kirby, Halsey and Vought shortly after receipt of the letter, and in discussing the matter, and what Kirby should do with respect to the purchase, Kirby was assured by Vought that he was in close touch with the situation. Kirby had immediately prepared a letter to be written in reply, in which

he attempted to outline the nature of the offer he was willing to make for the school property. Among other things, Roosevelt stated in his letter that the school would receive written bids on Monday, January eighteenth, five days after writing the letter of January 13, 1926.

Kirby had drafted what he believed was a sufficient reply to the letter of Roosevelt, outlining the nature of his offer to purchase. A draft of this letter was discussed with Vought, the probable price Kirby would have to pay, and the offer of the price, according to Kirby's testimony, was made a matter of discretion in Vought. Vought assured Kirby that he understood all about the transaction and how it should be handled. He had Kirby's letter and took it away with him, and he said he had everything he needed to present Kirby's offer for the property in the form in which it should be presented. He told Kirby that he had been notified by Roosevelt to attend the meeting of the trustees prior to January eighteenth; that he would go there and be there and take care of the matter as it should be taken care of, which assurance certainly warranted Kirby in relying on the broker at least making some bid.

The defendant real estate firm was acting for two other buyers; one of them a Mr. Robert Simon, who was engaged in the business of buying and selling real estate.

At the meeting of the trustees held on January eighteenth, Kirby did not attend, as Vought knew he would not; Halsey did not attend, and Vought did attend. Before the bids were opened, the trustees stated that they had met there to consider bids in writing, and intimated that they expected a bid from Kirby. Prior to the opening of the bids and while the bids were being opened, a statement was made that the trustees expected a bid from Kirby and asked where the bid was. During this meeting Vought said nothing about any knowledge he might have of Kirby's desire to bid, or any offer that he was authorized to submit on behalf of Kirby.

Simon's bid was submitted, and a second bid was submitted by a broker named Goodwin, who was a subordinate of Mr. Vought's, on the defendant company's letterhead. Robert E. Simon, a customer of defendant, was the person to whom the bid was awarded.

On January nineteenth, the following day, for the first time Kirby learned that no offer had been made for him on the day before. He was told on the night of the eighteenth by Vought that three other bids were submitted; that the trustees took an adjournment until the next day when they were to meet at Roosevelt's office and pass on what bid would be accepted. He went with Vought on the following Tuesday to close the transaction,

pay the money down and sign the contract, and there learned that no bid had been made in his behalf. On that day Kirby received back the copy of the proposed letter from the pocket of Mr. Vought. He read it to the trustees and stated the nature of the offer. He stated to them that for the purpose of putting himself in a better position as a buyer, he had purchased the lease next door from a Mr. Ehrich and had told Vought of that fact before the bidding on Monday; that Ehrich was not interested to submit a bid, although Kirby knew that Ehrich had received a letter similar to the one he had had from Mr. Roosevelt. When the trustees heard this they stated that had the bid been in the day before it would have made " all the difference in the world; " that they expected a bid from Kirby, but had not received it, but would not receive a bid then, because there had been explicit instructions in their letter that bids must be submitted in writing before three o'clock on Monday.

During the conference on Tuesday, Mr. Wheelock, one of defendant's officers, through Goodwin, one of Vought's subordinates, took a message to Mr. Roosevelt, to the effect that Mr. Wheelock insisted that the bids be closed as of the day before. The trustees decided that they would not consider any bid made by Vought on behalf of Kirby, as apparently he was attempting to arrange on Tuesday when they considered the matter closed; that they would sell the property, expressing their regret that the matter had gone through as it had, but that nevertheless they felt bound to carry out their arrangement.

Plaintiff contends that the defendant after it had been authorized in a plain manner to submit a bid, and to pay as much as in its judgment might be necessary to buy this property, was liable for the breach of contract in failing to formulate and submit a bid on behalf of plaintiff. For these reasons: That the plot to bid upon would be of substantially greater value to this plaintiff than to any one else since it was a keyplot right in the heart of the property the plaintiff owned, and because he had acquired the leasehold immediately next door to the east, and owned all the property to the west and to the south, and since defendant entered upon the performance of this undertaking by taking the letter of plaintiff into his possession and later actually attended the meeting of the trustees, and because it knew that plaintiff relied upon defendant to perform the undertaking committed to it. One who thus undertakes the performance of a confidential agency or trust, although he is not promised compensation for the services, is liable for a failure to perform the duties of the agency if by his misfeasance he causes damage to his principal.

The basis of the action consists in an undertaking to do something, and the injuring of the plaintiff by inducing him to rely on the undertaking. A voluntary undertaking renders one liable for the consequences of negligent failure to carry it out. Whether the action is regarded as based on tort, or whether it is regarded as contractual, a gratuitous agency, a consideration for the promise in such cases is found in the detriment to the promisee in allowing the promisor to perform. Allowing the other party to act as a gratuitous agent is a detriment which supports the promise of the agent. Such cases are likened to those where defendant is held liable for damages to goods caused by his neglect while carrying them, although not a common carrier, and the wrongdoer was not to receive compensation; and, in cases of gratuitous bailments, defendant is liable for a failure to take care of the goods which were bailed with him; and a gratuitous agent is liable for failure to exercise the ordinary amount of skill which he assumes to have. The confidence reposed, and the giving of the undertaking to another to render any service is a legal consideration sufficient to create the duty of performance. If one omits to do what he had agreed to accomplish, a failure of consideration may excuse the omission. If one begins the execution of an engagement and does not carry it to completion, his failure is misfeasance, and he becomes liable.

The defendant was bound by its engagement to submit the bid which plaintiff testifies he authorized it to make, or to notify the plaintiff that it would not, and thus enable him to protect himself against default. Its officer could not stand mute and allow the plaintiff's rights to be lost by inaction, where duty demanded action.

We think that the proof of plaintiff made out a good cause of action on the liability of defendant for its breach of duty.

As to the damages: The jury rendered a verdict of $75,000. The proof thereon by experts was not precise, nor eminently satisfactory. A witness, who was president of the Real Estate Board of New York, testified that the plottage value in January, 1926, was $240,000, notwithstanding a lease on the top floor of plaintiff's building which ran to October 1, 1933. This lease provided that at the end of the term, the tenant, if not in default, would have an option to extend the term of the lease to October. 1943, at an appraised rent; or, to buy at an appraised valuation, This witness stated that operators and real estate investors generally have no hesitancy in buying properties on such conditions.

Another qualified real estate broker and appraiser stated that in the absence of the lease, the plottage value would have been

at least $280,000. He made his estimate without knowing of the lease; and, while of the opinion that the lease would not preclude plottage value, could not state what that was.

One of defendant's witnesses testified that because of the lease there was no plottage value. On cross-examination, it appeared that in arriving at his conclusion he had not taken all the possibilities of plaintiff's ultimate control of the whole plot into consideration.

Another of defendant's witnesses testified that, notwithstanding the lease, there might be a slight plottage value, but he was not able to place ·a figure in dollars and cents. He admitted, on cross-examination, that he had not taken into consideration the prospects that the tenant by· default might lose the lease; that plaintiff might buy the lease; the possibility of the tenant's failure to exercise the option to purchase or elect the renewal for ten years; that to elect the renewal for ten years would terminate the option to purchase. All these considerations were elements which advantaged the owner and went toward showing value.

Plaintiff contends, as to the proof of damages, that such damages were within the contemplation of the parties when defendant undertook to act, and were the direct result of defendant's failure to submit his bid; that they were prospective damages and that they need not be proven beyond reasonable approximation; that the jury could disregard all of the experts' testimony and the verdict could not be set aside on the theory that it was against the weight of the opinion evidence; that there was no preponderance of evidence in favor of defendant's contention that the verdict was the result of mistake or prejudice, and that, notwithstanding the lease, there was a prospective plottage value to this land which, taking into consideration all the circumstances under which plaintiff might become the owner thereof, was lost to him by defendant's neglect or failure to make the bid. In the event too that there was a sale under the option to the tenant of the Madison avenue property, plaintiff's ownership of the rectangular plot including the parcel in controversy would enhance the value of the land and add to the award on appraisal if the whole plot were taken by the tenant on its option to purchase a part.

We think that a reasonable rule under the circumstances with respect to damages was adopted and that the judgment and order setting the verdict aside should be reversed, with costs, and the verdict reinstated.

DOWLING, P. J., MERRELL, O'MALLEY and SHERMAN, JJ., concur.

Judgment and order reversed, with costs, and verdict reinstated.