No. 18,657.

R. J. LESTER, ET AL. *v.* WILLIAM J. MARSHALL, ET AL.
(352 P. [2d] 786)

Decided May 31, 1960.

Mr. John T. Dugan, for plaintiffs in error.

Mrs. Patricia H. Maloy, for defendants in error.

*In Department.*

Opinion by Mr. Justice Doyle.

William and Louise Marshall, plaintiffs below and herein referred to as plaintiffs, purchased a home at 3200 South Delaware Street, Englewood, Colorado, on August 3, 1955. Plaintiffs paid the full purchase price of $18,500 in cash on the occasion of the closing. At this time there was an outstanding first deed of trust to the Industrial Federal Savings and Loan Association amounting to $11,152.43. Plaintiffs delivered to Mr. Richard Hurd, the broker who had the listing, a cashier's check payable to them and endorsed it in blank. Hurd made the disbursements called for on the closing statement, including the payment to the seller, the payoff of the second mortgage and other expenses, but failed to pay off the indebtedness to the Industrial Federal Savings and Loan Association. This amount he converted to his own use. Plaintiffs did not learn of this conversion until some three months had passed. They then brought an action and named Hurd, R. J. Lester and Ellen K. Wilson as defendants. Lester and Wilson, real estate broker and saleslady respectively, had represented plaintiffs in the transaction. Trial was to the court and during the course of it, Hurd confessed judgment and is not a party in this Court. At the trial's conclusion judgment

was entered against the defendants, Lester and Wilson, in the sum of $12,625.21. They seek review by writ of error.

There is little dispute in the evidence. Dr. Marshall is a minister who had resided at Rawlins, Wyoming, prior to the transaction hereafter described. He had visited Denver during 1954, during which time he became acquainted with the defendant, Mrs. Wilson, a licensed real estate saleslady employed by R. J. Lester, a real estate broker. Upon deciding to move to the Denver area in July 1955, the Marshalls employed Mrs. Wilson to locate a house for them. Mrs. Wilson showed plaintiffs several houses, none of which were satisfactory to them. Then, on July 27, 1955, plaintiffs called Mrs. Wilson and told her that they had located a house and asked her to show it to them. This is the house described above which was then listed with the defendant Hurd.

After being shown the house, the Marshalls and Mrs. Wilson went to the Lester real estate office and proceeded to fill in a form receipt and option contract for the purpose of making an offer to the defendant Hurd. The Marshalls gave Lester a check for $900 to be transmitted with the contract to Hurd. Mrs. Wilson had told the Marshalls that she and Lester were in a listing exchange arrangement with Hurd. The offer providing for a sale price of $18,000 was transmitted to Hurd. Telephone negotiations followed between Mrs. Wilson, acting for plaintiffs, and Hurd, acting for the sellers. As a result of these negotiations, the sellers, who had demanded $19,500, agreed to sell for $18,500, subject to modifications all of which were inked into the contract. Plaintiffs agreed to buy for this amount.

It is noteworthy that the Marshalls were insistent that they obtain possession on August 3, 1955, and that the property should be free and clear of encumbrances. They inquired of Mrs. Wilson as to how the existing encumbrances were to be paid off. She, in turn, according to her testimony, told them that this was all handled by

the broker at the time of the closing. Her statements to the plaintiffs were of such a nature as to reassure plaintiffs that this was a matter of routine.

After the contract was completed and signed, plaintiffs returned to Rawlins, telling Mrs. Wilson that they would not be back to Denver until the date of the closing. She in turn assured plaintiffs that she would take care of everything.

On August 3, 1955, the closing took place at the office of defendant Hurd. A settlement sheet presented by the broker, Hurd, disclosed in detail various items of receipts and disbursements, including the outstanding obligation to the Industrial Federal Savings and Loan Association in excess of $11,100. Plaintiffs accepted delivery of a warranty deed which purported to convey the premises free and clear of all liens and encumbrances. The plaintiff, Dr. Marshall, then endorsed his cashier's check in blank and delivered it to Hurd.

Again, after the closing, the plaintiffs expressed some apprehension to Mrs. Wilson and she again assured them that they had nothing to worry about and that she would take care of everything. The testimony establishes further that neither Mrs. Wilson nor Lester advised the plaintiffs to retain an attorney or to have the title examined. Mrs. Wilson did testify, however, that on her own initiative she had requested a title opinion from Hurd's lawyer. No such opinion was ever provided.

Some weeks after the closing, plaintiffs called the Lester office and complained that the deed (which Hurd was supposed to have recorded) had not been received. Lester then called Hurd, who stated that through an oversight the deed had not been recorded. Lester did not inquire as to whether the deeds of trust had been released. The information that the Industrial Federal deed of trust had not been paid off did not come to light until some time later in the fall of 1955. The existence of the unpaid note came to plaintiff's attention after Hurd failed to make the November payment. There-

after they kept the loan in good standing and subsequently commenced the present action.

The trial court found that the defendants Wilson and Lester were buyers' agents; that they were aware of the plaintiffs' desire to pay cash and had undertaken the employment with this in mind; that Mrs. Wilson had given the plaintiffs assurance that she would see to it that their wishes were carried out fully. The court concluded that the two agents had by their representation and conduct lulled the plaintiffs into a false sense of security as a result of which the plaintiffs failed to take steps which they would otherwise have taken in order to protect themselves, and as a consequence the loss was suffered. The court also reasoned that apart from the express terms of the agency, the real estate broker was obligated, under the circumstances such as those disclosed, to protect his client against the kind of hazard here present, and concluded that this duty could have been discharged and the loss avoided if the defendants had instructed the plaintiffs to draw checks jointly to the owner and the holders of the first and second deeds of trust or had they themselves held the funds in escrow, or if they had instructed plaintiffs to specially endorse the cashier's check to Lester and Hurd as joint endorsees.

Defendants argue that there was neither contractual nor tort obligation towards the plaintiffs following the closing; that their duties were discharged once the deed was delivered and that the risk of the conversion was one to which the plaintiffs subjected themselves when they delivered the bearer check to Hurd.

Defendants further argue that the evidence fails to support a judgment against Lester either directly or vicariously and, thirdly, that Mrs. Wilson and Lester were agents of the plaintiffs; that their relationship to the plaintiffs at the time in question was a gratuitous one which imposed no legal obligations.

*The determinative question is whether the defendants*

*were legally obligated to take preventive measures to
protect plaintiffs from loss, or having failed to do so,
whether they were required to ascertain whether the
encumbrance was actually paid off.*

There are two theories upon which the liability of de-
fendants here is predicated. The first of these is based
upon the failure of defendants to carry out an express
undertaking which the plaintiffs had relied on them to
carry out, as a result of which the plaintiffs suffered a
loss. The second is failure to perform a duty implied in
relationship of real estate broker and client. See 2
*Harper and James, Torts,* 1053. The trial court was of
the opinion that both of these duties were present and
that the evidence was sufficient to establish violations.

Our conclusion that the evidence was sufficient to
support the trial court's finding that there was an ex-
press undertaking by the defendants on which the plain-
tiffs relied to their damage renders unnecessary a con-
sideration of the legal duties implicit in the relationship
of broker to client.

We deem it significant that the plaintiffs resided
out of Denver and that they were thus dependent on the
services of the defendants. Defendants, in turn, were
agreeable to plaintiffs' leaving the arrangements to them
since they did not recommend employment of counsel to
examine the title and to render services at the time of
the closing. The assurances given to the plaintiffs that
everything would be taken care of prior to the closing;
that they would get a title free of encumbrances; that
the disbursements were made routinely; and that every-
thing would be cared for after the closing, resulted in a
quieting of any apprehension plaintiffs may have had
and a reliance on the defendants to perform whatever
duties were requisite to complete the transaction with-
out complications. This latter is evidenced by the fact
that plaintiffs departed for Rawlins immediately after
the contract to purchase had been executed and made no
effort to adopt other means for their protection.

The ultimate issue for determination is whether these facts render defendants liable to plaintiffs in tort. Where one gratuitously undertakes by promise or conduct to perform acts of service and thereby causes another to refrain from performing such acts, does he owe the other the obligation to use care in the performance of the services or to give notice that he will not perform? The relevant principle is well recognized and well stated in 2 *Restatement, Agency,* Section 378 (1958), which states:

"One who, by a gratuitous promise or other conduct which he should realize will cause another reasonably to rely upon the performance of definite acts of service by him as the other's agent, causes the other to refrain from having such acts done by other available means is subject to a duty to use care to perform such service or, while other means are available, to give notice that he will not perform."

Where, as here, the promise grows out of a *contractual* relationship, the duty emerges more clearly than where there is no such relationship. The pre-existing agency gives character to an undertaking which might otherwise be regarded as too vague to justify reliance. Existence of an agency supported by a consideration renders more credible the fact of the undertaking as well as the reliance.

There is evidence in the record indicating that the plaintiffs were not inexperienced in closing real estate transactions. The trial court did not find, however, that this fact in any way nullified the obligation of defendants to plaintiffs who relied on defendants to protect them. We are of the opinion the trial court's finding is adequately supported.

The evidence here was sufficient so that the trial court acted properly in holding that Hurd's conversion or embezzlement was a hazard which a reasonable person in the position of the defendants should have foreseen and should have acted affirmatively to prevent. See *Harper*

*and James, Torts,* Sec. 16.12, pages 942 and 943 and notes 10, 11 and 12, p. 943. See also *Restatement of the Law of Torts,* Sec. 302 and Sec. 442. Utter failure of defendants to take even minor precautions constituted negligence.

There are many examples in the cases holding liability growing out of gratuitous undertakings. Only representative ones need be cited in order to show that the duty here is a familiar one. A recent New Hampshire decision, *Brunel v. The Nashua Building & Loan Association,* 95 N.H. 391, 64 A. (2d) 315, is illustrative. There the action was against the vendor who had undertaken to look after the purchasers' interest and to give good title. It appeared that the vendor's secretary had orally assured plaintiffs that they would receive good title and that all steps would be taken to protect their interests in completing the transaction. The property was conveyed by quit claim deed subject to an encumbrance which was unknown to plaintiffs. This encumbrance was a tax sale which had occurred some time before. In upholding a verdict in favor of the plaintiffs, the New Hampshire court expressed the view that the duty exists even if there has not been an agency:

" * * * The evidence warrants a finding that the defendant in effect volunteered to act as the plaintiffs' agent and see to it that they received an unencumbered title. The latter reasonably relying upon this promise, hiring no lawyer and taking no other means to protect themselves, were damaged as a result. In such cases the law is clear that they may recover. (Citing cases.)

"Actually it is not necessary to call the defendant the plaintiffs' agent to hold it responsible. If it may be said that the defendant voluntarily assumed to act in any capacity, under the circumstances here, it is liable for the breach of its common law duty to use ordinary care. 'The duty to use care in rendering a service arises not from a right to receive the service, but from the relation between the parties which the service makes.' Tullgren

v. Amoskeag Mfg. Company, 82 N.H. 268, 276, 133 A. 4, 5, 46 A.L.R. 380. [Citations omitted.]"

Other analagous examples include *Erie R. R. Co. v. Stewart*, 6th Cir., 40 F. (2d) 855, holding a railroad liable for failure to give a warning at a crossing where the public had grown accustomed to the presence of a crossing watchman. *Seigel v. Spear & Co.*, 234 N.Y. 479, 138 N.E. 414, holds a warehouse man responsible for loss of plaintiffs' furniture on the basis of an undertaking to store the furniture free of charge and to obtain insurance. See *Kirby v. Brown-Wheelock, etc.*, 241 N.Y. Supp. 255, 229 App. Div. 155, affirming a judgment (later reversed on other grounds, 255 N.Y. 254, 174 N.E. 652) against real estate brokers who had suggested that the plaintiffs purchase a tract of land and had gratuitously promised to make the bid for him when it was auctioned. Their failure to take the action which they had promised to take was the basis for holding them liable. The early New York case of *Thorne v. Deas*, 4 Johns N.Y. 84 (1809), denied a recovery where the plaintiff had relied on the defendant's gratuitous promise to obtain insurance on a ship which was later lost at sea. The action there was indebitatus assumpsit. Professor Seavey in 64 Harv. L. Rev. 913, comments at length on the *Thorne v. Deas* ruling. He attributes the reluctance of Chancellor Kent, the writer of the opinion, to define liability in that case to the then lack of development of the law of torts. Since the year 1809, however, the distinction between nonfeasance and misfeasance has disappeared as has the requirement of privity of contract. Moreover, the concept of legal duty to act carefully, following an affirmative undertaking, has undergone considerable evolution so that, according to Professor Seavey, the principle here applicable can now be formulated as follows:

"Where a person represents by word or act that he has done or will do something upon the performance of which he should realize that others will rely, he is liable

for expectable harm caused by the reliance of others and his failure of performance, if his representation was negligently or intentionally false, or if without excuse he fails to perform."

In the case at bar, all the elements of the above tort are present. The evidence shows an agency pursuant to which the defendants represented that they would act affirmatively for the protection of the plaintiffs. It establishes plaintiffs' reliance on the undertaking to their damage and complete nonaction (neither precautions nor warnings) on the part of the defendants in the face of expectable harm. We hold, therefore, that the findings and conclusions of the trial court in this regard and its judgment for the plaintiffs were well founded in fact and in law.

The further contention of the defendant Lester that he cannot be held responsible because Mrs. Wilson was acting independently of him is not valid. The agency of Mrs. Wilson is undisputed. Moreover, she was doing the very things required of her as a real estate saleslady. We find no merit in the further contention of the defendants that they were in truth agents of Hurd rather than of the plaintiffs. This theory is contradicted by the history of this transaction which shows that Lester and Mrs. Wilson represented plaintiffs from the negotiation stage through its final closing. In view of our conclusion, it is unnecessary to consider the alternative legal theory of the plaintiffs that Lester, Mrs. Wilson and Hurd were acting as joint venturers or as partners whereby the present defendants were vicariously responsible for the misdeeds of Hurd. See *Kayser v. Maugham,* 8 Colo. 232, 6 Pac. 803, and *Stark v. McKenna,* 124 Ore. 332, 263 Pac. 391.

The judgment of the district court is affirmed.

MR. CHIEF JUSTICE SUTTON and MR. JUSTICE HALL concur.