Gabriel G. **TAUBER** and G. G. Tauber Co., Inc., Appellants,

v.

George M. **JACOBSON** and Harry C. Racoosin, Appellees.

No. 5609.

District of Columbia Court of Appeals.

Argued Sept. 14, 1971.

Decided Aug. 3, 1972.

Rehearing Denied Aug. 31, 1972.

------

Joseph G. Dooley, Washington, D. C., for appellants.

A. Fred Freedman, Washington, D. C., with whom William R. Lichtenberg and Joseph Luria, Washington, D. C., were on the brief, for appellees.

Before KERN, NEBEKER, and REILLY, Associate Judges.

REILLY, Associate Judge.

A disagreement among friends over their respective rights to season tickets for the local professional football games culminated in a lawsuit, a trial, and a judgment requiring the purchaser of the tickets, some four in number, to transfer to plaintiffs his option to renew his subscription in future seasons for two of these tickets. This case is here on defendants' appeal.

The evidence upon which the trial judge based his order is not altogether clear, as he made no written findings of fact, although the testimony of the principal witnesses presented certain conflicts. Even the testimony of the two plaintiffs contained certain contradictions. So far as we can gather from the transcript, however, the background of the controversy began in the summer of 1961.

Appellant Gabriel G. Tauber, against whom this suit was brought,[1] and Harry C. Racoosin, together with their wives, had previously attended games with some degree of regularity when the Washington professional football club, popularly known as the Redskins, played at Griffith baseball park. In the summer of 1961, when the District of Columbia stadium was being constructed, the Redskins, having signed a lease committing them to schedule home games at the new facility, undertook through newpapers to promote the sale of season tickets. At that time, Tauber's office was across the street from the business office of the football club. He was acquainted with the ticket manager and other members of the staff. Having read the newspaper stories, he dropped in to see the staff and was advised that the best seats were in the mezzanine section. According to Tauber's uncontroverted testimony, he was urged to take ten or fifteen season tickets[2] in that area, but decided to pur-

1. By amendment to the complaint, G. G. Tauber Co., Inc. was made a codefendant upon a showing that Tauber at some time notified the ticket sellers that he was designating the corporation as the holder of the four tickets. As the company is controlled and operated by Tauber (it is listed as a mail-order business), the rights of both defendants for the purposes of this lawsuit are one and the same.

2. Other portions of the record reveal that it was apparently the policy of the Club to offer large blocks of tickets to business firms which were then free to resell them or use them for goodwill and entertain-

chase only four "figuring that I could use one, myself, and that I could invite other people that I knew." He then reserved four tickets for numbered adjoining seats in a designated mezzanine box, and in payment drew and presented a check for $168 —the full purchase price of all four season tickets—before approaching any of his friends.

From then on, the sequence of events is somewhat clouded by the conflicting recollections of four of the men who subsequently used these tickets in various seasons.[3]

Tauber testified that when driving the plaintiff Racoosin home that night, he told him of the transaction and suggested that he take one of the tickets. The next day they drove to the then unfinished stadium, where Tauber pointed out the location of the seats. Racoosin agreed to buy one of the tickets and paid Tauber for it. Later Tauber approached two other mutual friends, Jerry Middleman (now deceased) and Robert Stein, a downtown tailor. Each agreed to buy one of the remaining tickets for which he reimbursed Tauber.

In subsequent years, the Redskins adopted a procedure under which prior season ticket-holders were sent invitations in February to renew their rights to the same seats by mailing in a $10 deposit for each place in the early spring and paying the balance before the opening game. It was Tauber's custom to pay the deposit for all when the first notice arrived and then telephone the same trio to ascertain whether they wished tickets for the ensuing season. Each would then reimburse Tauber for his share of the preliminary payment and, when told later in the year that the final balance was due, would make another payment. Under these arrangements the friends occupied the same four seats in succeeding seasons until 1963, when Middleman fell ill and subsequently died. His place was taken by George M. Jacobson, proprietor of a grocery and liquor shop, who entered into the same arrangement. Early in 1969, however, Tauber informed both plaintiffs in separate conversations that he was no longer going to offer them his tickets. On the witness stand, he testified that he had committed himself to sell his tickets to a local bank with which he did business.

Racoosin testified that he and Tauber together selected the seats in the stadium in 1961, that he had the use of two of those tickets, and as he had done before the new stadium was built, continued to take his wife to the games with him for a year or two, and then "assigned" the ticket to Jacobson.[4] He said that he was obligated to pay for the tickets each year pursuant to an oral agreement with Tauber, that this arrangement had begun when the games were still played at the old location, and that the reason Tauber bought the tickets annually was because of the proximity of his office to the Redskins.[5] He also testified that after Tauber discontinued the arrangement, he and Jacobson then purchased tickets for the games in 1969 and 1970 from Milton Kronheim (identified by Jacobson as a businessman with whom he had been dealing for 35 years) but that these seats were less satisfactory than those which Tauber had bought.

Jacobson testified that he had known Tauber for 50 years, that they both had apartments in the same building, and that he had been a friend of Racoosin for al-

---

ment purposes. *See also*, article in The Washington Post, January 16, 1972, captioned "Even the Waiting List Has a Waiting List."

3. At least two of these witnesses were retired, elderly men.

4. The verb "assign" in this context is, of course, a word of art tantamount to a legal conclusion. In this instance, the word was used not by the witness but by his counsel in putting a leading question. While no objection to the question was raised, the burden was still on the plaintiff to adduce facts to support such a conclusion.

5. Tauber, who took the stand later, testified that he never bought season tickets prior to the erection of the new stadium, but only tickets for individual games.

most as long a time. He stated that it was the latter who informed him that he had "an extra seat" for the football games which he, in turn, accepted but that his way of obtaining the ticket was to respond in the spring of each year to a telephone call from Tauber with regard to the preliminary deposit and to pay his share, and when subsequently called (also by Tauber), to mail him a check for the balance. Contrary to the recollections of his co-plaintiff, he placed the time of this arrangement as of the opening of the new stadium. In early 1969, Tauber visited him and said he would not get his tickets for that year as he wanted to give them to his bank. He subsequently arranged to get seats from Milton Kronheim—a matter of courtesy to an old customer—but that such seats were much farther from the gridiron than the one previously obtained through Tauber.

On cross-examination, he was asked whether he had any contract with Tauber. He said he had no written contract and when questioned as to a possible oral one, finally answered—

.    .    . No oral contract, at all, other than the fact that the man had been asking me to do the same thing for a number of years, which I continued to do.

Stein, aged 73, called by defendants, testified that he was one of the group of four who attended the games with Tauber and Racoosin in the new stadium, and that Middleman [6] was the fourth member at the beginning, and that Jacobson succeeded Middleman after his fatal illness. He said that each year Tauber would inquire as to whether he would like to go, and upon receiving an affirmative answer, would ask him for the deposit. He said that until he dropped out of the group, it was Tauber's custom to pick up his three friends in his own car and drive them to the stadium. When he was asked on cross-examination how he happened to give up his ticket, Stein replied that he "never had a ticket" and went on to explain that in the years he

wished to go to the games, Tauber would tell him he had tickets for him.

The only other witness at the trial was a member of the football club's business staff, who testified that after the 1961 season it was the practice of the club to give season ticket-holders the privilege of renewing their subscription to the same seats assigned them the previous year. He said that the practice did not stem from any contract or guarantee offered the ticket-holders, but had developed as a matter of policy.

The trial court adjudged the plaintiffs solely entitled to the season tickets claimed respectively by them, with "all rights incident thereto" [presumably including renewal privileges] beginning with the 1971 season. Although the football club was not party to the suit, the court framed a decree authorizing the Redskin management to transfer upon its records registration of the tickets to appellees. Counsel in oral argument informed this court that such transfer had been made.

As previously noted, the trial court made no findings of fact to resolve the conflicts in testimony—possibly because none of them affected the legal issues, a conclusion at which we have also arrived. From the bench, the court found as a matter of law that a gratuitous agency had been established—"a voluntary relationship created, at the suggestion .  .  . of the defendant, [appellant here] himself"—which precluded Tauber from acquiring a "title to interest" in these tickets, permitting him to dispose of them as he saw fit.

Before reaching this conclusion, the court pointed out that there was no obligation on the part of Tauber to act as agent for the plaintiffs, that his picking up the tickets each year was for "the sake of convenience," that he could have discontinued the relationship at any time, and if he regarded the tickets as his own personal property, he should have advised plaintiffs of this fact before tickets for choice seats became

---

6. The transcript at this point refers to him as "Middleton."

unavailable.[7] The court went on to observe that by reason of Tauber's course of conduct, and the plaintiffs' reliance on the annual procurement by him of tickets, they obtained an interest which he had "no right to usurp."

Noting that there was no compensation for the asserted agency, the court rejected appellant's contention that in the absence of any agreement reduced to writing between the parties, plaintiffs' claims were barred by the statute of frauds. On this point, the court found that there was no contract, but "an implied agency . . . consummated from time to time by the acts of the respective parties."

After reviewing the testimony in this record, however, we have difficulty in accepting the court's reasoning. In view of the admittedly gratuitous character of Tauber's commitment to his erstwhile football companions, the court's holding to be supported must rest on some principle of promissory estoppel, reflected in the obligations imposed even upon voluntary and uncompensated agents, where the promisee relies to his detriment upon such persons.[8]

We are aware that much water has gone under the bridge since Lord Selbourne declared that—

I have always understood . . . that the doctrine of estoppel by representation is applicable only to representations as to some state of facts alleged to be at the time actually in existence, and not to promises de futuro, which, if binding at all, must be binding as contracts.[9]

The courts now recognize that under certain circumstances a purely gratuitous undertaking to perform stated services may create a legal obligation, Lester v. Marshall, 143 Colo. 189, 352 P.2d 786, 790

(1960); Abresch v. Northwestern Bell Telephone Company, 246 Minn. 408, 75 N.W.2d 206 (1956). It is also well settled that if someone volunteers to purchase specific items for another, and then purchases them for himself, he will be deemed as agent to hold them for the other's account, Nye v. Lovelace, 228 F.2d 599, 603 (5th Cir. 1956). See also Rodes v. Shannon, 222 Cal.App.2d 721, 35 Cal.Rptr. 339 (1963); Boulevard Plaza Corporation v. Campbell, 254 Minn. 123, 94 N.W.2d 273 (1959).

Applying these principles to the instant case, we would have no hesitation in holding that in any year in which Tauber called his friends and requested them to forward their share of the deposit if they wished to attend the games with him during the coming season, he thereby made himself their agent and was bound when the tickets were ultimately delivered to turn them over. Such holding would seem to follow from Tauber's invitation to the plaintiffs, described by one of them (Jacobson) as "asking me to do the same thing for a number of years."

The trial court, however, has gone much further by holding in effect that in every subsequent year when Tauber exercised his renewal season ticket privileges, he was bound to treat two of the tickets as the property of the plaintiffs. This holding could be supported if the record showed that (a) in 1961, Tauber bought two of these tickets only because he was authorized by Racoosin to act as the latter's agent, or (b) the parties entered into a contract committing Tauber always to offer one ticket to each of the plaintiffs at cost, or in the alternative to make permanent transfer of his subscription option to them.

We find no substantial evidence in the record to sustain either hypothesis. As

7. The trial court apparently took judicial notice of the fact that a few years after the new stadium opened, the demand for season tickets exceeded the supply.

8. See Restatement (Second) of Agency § 378, Gratuitous Undertakings (1958).

9. Maddison v. Alderson, 8 App.Cas. 467 (1883). Accord, Troy v. Rogers, 113 Ala. 131, 20 So. 999 (1896).

we have previously observed, appellant's testimony that in 1961 he paid for the block of four tickets recommended to him by the vendors before approaching Racoosin is uncontradicted.[10] Moreover, even if the latter's willingness to take two of the tickets —Tauber testified it was only one—should be viewed as ratification, this would not mean that such assent conferred renewal rights upon Racoosin, for the record shows that no guarantee of such priority was made to Tauber or other ticket purchasers at that time.

Thus, even Racoosin's testimony falls short of establishing in 1961 any agency relationship with Tauber beyond the particular year, for as the plaintiff described it from the witness stand, Tauber's role in buying tickets was a season-to-season arrangement of "convenience" beginning long before the new stadium was built. The "convenience" in question was the proximity of Tauber's place of business to the club's office. There is no evidence in the record that Tauber personally picked up the tickets at such office after the 1961 season. Obviously he would have had no occasion to do so thereafter because the notice of renewal privileges and the payment of the requisite checks was done by mail. Accordingly, if Racoosin deemed himself the owner of two tickets, he would undoubtedly have requested a transfer of registration to him once the club policy of offering renewal privileges to season tickets had become a matter of public knowledge.

It is unnecessary to elaborate upon this point, for the trial court conceded that Tauber could have treated the tickets as his own—thereby averting the controversy which gave rise to this case—had he advised his friends of this fact when tickets for comparable seats were still available to the public.

The record is also barren of proof of any agreement creating an obligation on Tauber's part to act as agent for the plaintiffs beyond any given season. Jacobson expressly disclaimed the existence of such an agreement. It is true that Racoosin testified to the contrary, asserting that he had an oral agreement with appellant. The term "agreement", however, is a word of art in the statute of frauds.[11] This particular testimony amounted to nothing more than the legal conclusion of the witness. No attempt was made to elicit from the witness either the words or the substance of this oral understanding. But even if such agreement had been made and plaintiffs had relied on it to their detriment, the failure of the parties to reduce it to writing made it unenforceable. This court has held that the refusal to carry out an oral agreement requiring performance for more than one year does not prevent the application of the statute of frauds, notwithstanding the hardship incurred by the claimant relying upon it, Easter v. Kass-Berger, Inc., D.C. Mun.App., 121 A.2d 868 (1956).

Tauber's method of dealing with his friends, moreover, is plainly not consistent with the notion that he had agreed or promised to act as their agent for an indefinite period. His testimony, corroborated by both plaintiffs, was that when he received notice from the club each year that the same season tickets would be available to him, his practice was to telephone each plaintiff, tell him the current amount of the deposit, and ascertain whether he was interested in renewing the arrangements of the previous year. Had there been an understanding binding him to make such arrangements in their behalf indefinitely, he would not have needed to check annually on their wishes in the matter. He could simply have gone ahead and ordered the tickets and billed each friend for his aliquot share after

10. We do not view Racoosin's testimony that he participated in the selection of the particular seats as contradicting Tauber's version, for both witnesses agree that this plaintiff became aware of the seating plan either by a diagram or a visit

to the stadium before committing himself for tickets.

11. Incorporated into D.C.Code 1967, § 28–3502.

he had sent a check to the club covering the total subscription.

■ We turn now to the grounds on which the court rested its decision, *viz.*, that although appellant might originally have rightly claimed sole ownership to his ticket privileges and never entered into any express contractual obligation to continue his arrangements with appellees, his course of conduct over the years created an implied agency amounting to a constructive trust. The conduct in question apparently was the fact that for a period of some six to eight years, Tauber had adopted the habit of inviting his friends each year to accompany him to the games, provided they reimbursed him for the tickets, and their reliance in turn upon the prospect of his continuing to do so.                          .

In our opinion, this goes far beyond any doctrine of promissory estoppel as reflected in the law of gratuitous agency. It is well established that mere expectancy of a continued course of conduct is not enough, even in situations where the disappointment of expectations results in a heavy financial loss. In the leading case of Luther v. Coal Operators Casualty Company, 379 Pa. 113, 108 A.2d 691, 693 (1954), it was held that where an insurance company had voluntarily renewed a workmen's compensation policy for three successive years without request by the insured, such course of conduct created no duty on the part of the insurer to continue to do so. This decision is in accord with the weight of authority, Mutual Fire Insurance Co. of Covington v. Candler, 327 S.W.2d 20 (Ky.1959); Standard Casualty Company v. Boyd, 75 S.D. 617, 71 N.W.2d 450 (1955); Redeman v. Preferred Acc. Ins. Co., 215 Wis. 321, 254 N.W. 515 (1934). If this is the rule in commercial relationships, it would be paradoxical to construe a gratuitous course of conduct as establishing a binding obligation, especially among persons not associated in any enterprise or business from which a fiduciary relationship could be inferred.[12]

Accordingly, we have concluded that there was no valid basis for the judgment depriving appellant of his season tickets, with the privileges incidental thereto, and that the decree implementing such judgment should be vacated and his rights restored.

Reversed and remanded for the entry of a decree consistent with this opinion.

12. *Cf.* Opinion of Cardozo, C. J., in Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928), *and* Judge McArdle's decision in another football season ticket case where an employee advanced funds to purchase tickets for his corporation—which he bought in his own name—tried to keep his rights thereto after quitting his employment. Golden Commissary Corp. v. Barefoot, Super.Ct.D.C. (No. 4418–71, decided Sept. 8, 1971). Such situations are clearly distinguishable.