James S. DAWSON, III, Appellant,

v.

**NATIONAL BANK & TRUST COMPANY**
(formerly known as National Bank & Trust
Company of Charlottesville) and Parke H.
Brady, Executors under the Will of Joseph
James Ryan, Deceased, Appellees.

**No. 7637.**

District of Columbia Court of Appeals.

Submitted Jan. 22, 1974.

Decided April 4, 1975.

David A. Splitt, Washington, D. C., was
on the briefs for appellant.

Gerard E. Mitchell, Washington, D. C.,
was on the brief for appellees. Jacob A.
Stein, Washington, D. C., also entered an
appearance for appellees.

Before REILLY, Chief Judge, and FIC-
KLING and GALLAGHER, Associate
Judges.

REILLY, Chief Judge:

This is an appeal from a judgment
against a tenant in an action for damages

and unpaid rent pursuant to the terms of a written lease. The court (setting without a jury) found the tenant liable for (1) $12,752.12 for damages caused the leased premises after frozen water pipes burst inside the rented house; (2) $7,334.00, represeting the balance of unpaid rent; (3) $499.00, the sum paid by the landlord for supplying fuel oil; and rendered a total judgment against him of $19,585.12.[1]

The record shows that appellant, the tenant, and Colquitt Realty, Inc., agent of the owner, executed the lease of a detached single dwelling house at 1800 Foxhall Road, N.W., for $1,000 per month for a term of one year commencing on March 10, 1969. Appellant occupied the premises for about five months. In early August 1969, he moved out and returned to his farm in Huntly, Virginia, explaining in a letter to the agent that he was leaving because of financial reverses. Upon departing, appellant turned over his keys to the premises to the rental agent, and in his letter requested the agent "as a favor" to find a new tenant to take over the balance of the unexpired term of the lease. The agent, after accepting the keys, did attempt to do so but, despite advertising and showing the interior of the premises to prospective customers, was unable to comply with this request.

As winter approached—the house having been vacant for several months—the rental agent obtained permission from the owner to order fuel oil to maintain heat in the premises (reserving all rights against appellant for payment of all fuel bills incurred) and thereafter made arrangements with Metropolitan Fuels Company to have oil delivered to the premises. The fuel company delivered oil on December 27, 1969, and started the furnace manually. The rental agent visited the premises during the month of January 1970, and found the furnace operating and the house reasonably warm. In late January the fuel company again filled the tank, delivering some 900 gallons of oil.

Between February 18 and 23, the fuel company sent another oil truck to refill the tank but the trucker discovered it was still full. This prompted him to look into the windows; whereupon he noticed that the house was flooded—the result of bursting pipes in a frozen water system. It was discovered that the manual switch operating the furnace had been turned off and that subsequent cold weather caused the temperature in the house to fall below the freezing level. The cost incurred by the owner of the house in repairing the pipes, plumbing fixtures, furniture, and redecoration exceeded $12,000.

The owner having died, an action was brought by his executors against the tenant and the rental agent to recover these damages, including reimbursement of the heating oil payment. The complaint also sought an additional sum against the defendant for unpaid rent.

In a memorandum opinion including findings of fact and conclusions of law, the trial court found no liability on the part of the agent, holding that it exercised reasonable care in its duty to protect the property of the principal. The court found as a fact that the bursting of the pipes had been caused by the turning off of the furnace control switch, but that there was no evidence to indicate who had done the turning. The court concluded that the tenant was liable for the ensuing damage, finding that his abandonment of the premises and his refusal to supply heating fuel amounted to negligence and that by the express conditions of the lease, the tenant was required to pay for any repairs made necessary "due to the negligence by acts of commission or omission of the tenant" and to surrender the premises at the end of his

---

1. On appeal, the tenant does not contest that portion of the judgment relating to unpaid rent nor does he in his brief advance arguments against the third item. In any event, as this opinion makes clear, the tenant was liable for heating costs. Consequently, this decision is concerned only with the first item.

term in "good, clean and operating condition, ordinary wear and tear excepted."

According to the court, the fact that the plaintiffs—through the rental agent—undertook to supply the premises with fuel, did not relieve the tenant of responsibility. The court also concluded that in the absence of a clause in the lease authorizing the lessor to reenter the premises upon the tenant's default and to relet them, there was no duty on the owner's part to mitigate damages by trying to find another tenant, and cited Simons v. Federal Bar Building Corporation, D.C.App., 275 A.2d 545–50 (1971).

An examination of the lease reveals, however, that such instrument did contain a provision authorizing the lessor to recover possession in the event of any default. Whether this clause met the conditions noted in the *Simons* case need not be decided, as the appellant (tenant) is not challenging that portion of the judgment holding him liable for unpaid rent. Thus in this posture of the case, the apparent undertaking of the owner's agent to help him reduce potential rental indebtedness by showing the house to other prospective tenants may be viewed as gratuitous.

■ But even the absence of any legal duty to attempt to diminish the tenant's rental liability does not mean that what the rental agent gratuitously undertook to do, has no bearing on the issue raised on appeal. Under some circumstances, a purely gratuitous undertaking to perform certain services may subject a person to a legal obligation. *See* Tauber v. Jacobson, D.C. App., 293 A.2d 861–65 (1972), and cases cited therein; Lester v. Marshall, 143 Colo. 189, 352 P.2d 786 (1950); Abresch v. Northwestern Bell Telephone Co., 246 Minn. 408, 75 N.W.2d 206 (1956). The relevant principle is expressed in Restatement (Second) of Agency § 378 (1958) as follows:

One who, by a gratuitous promise or other conduct which he should realize will cause another reasonably to rely upon the performance of definite acts of service by him as the other's agent, causes the other to refrain from having such acts done by other available means is subject to a duty to use care to perform such service or, while other means are available, to give notice that he will not perform.

Were this a case where the tenant had abandoned the premises in the winter without taking such reasonable precautions as draining the pipes and shutting off the main valve to the outside water main or, in the alternative, hiring a caretaker to see to it that the interior of the house was kept warm enough to avoid freezing of the water system, we would have no hesitancy in affirming the trial court's conclusion that the tenant was negligent. The case is not as simple as that, for the record presents a question as to whether the tenant might not have reasonably relied on the owner's agent to have averted the catastrophe which subsequently occurred.

■■ In considering this issue, we note at the outset that the tenant did not vacate the house without notice to the landlord. He not only wrote to the latter's agent, but surrendered the keys to such agent. By accepting the keys, agreeing to exhibit the house to possible tenants, and then later authorizing a fuel company not only to maintain an adequate supply of oil but to go inside the house and turn on the furnace switch, it would appear that the owner, through his agent, knowingly relieved the tenant of control of the premises. Moreover the agent, at the owner's direction, notified the tenant that additional heating oil had been provided, and requested him to pay for it. Under these circumstances, reliance by the tenant on the agent's seeming willingness to act as caretaker was not unreasonable.[2]

2. It is true that the tenant refused to recognize that the fuel bill was his obligation, perhaps because he felt that a cheaper method of avoiding freezing was to drain the pipes.

Nevertheless, this notice made him aware that the owner's agent had undertaken the responsibility of maintaining the premises, and in any event, failure to pay for the oil was

The trial court correctly found that the freezing of the pipes here was caused by someone—whose identity is unknown—turning off the switch which kept the furnace in operation. In cases of this sort, this court has held that where the evidence did not reveal a specific act of carelessness, negligence could be attributed to the person in control of the premises under the doctrine of *res ipsa loquitur*. Powers v. Coates, D.C.App., 203 A.2d 425 (1964). In *Powers,* the lessee and his family left a rented house unoccupied from December 22 to January 3 one particular winter, to go on vacation. On their return they found the pipes and radiators extensively damaged apparently because the water in the pipes and fixtures had frozen in their absence.

In holding the *res ipsa* principle applicable, this court said:

> The heating system and the water system within the house were within the control of the tenant. Ordinarily the water in the pipes, radiators and other fixtures in a dwelling house will not freeze unless through negligence proper precaution is not taken to prevent it. One of the reasons behind the rule of res ipsa is that the defendant has greater access to the cause of the accident than does the plaintiff, and such is the case here. [*Id.* at 428.]

In contrast to that situation, it is plain that in the case now before us the tenant had relinquished his access to the house to the owner's agent, and that the only persons who had access during the critical period were the employees of the agency and such personnel of the fuel company as were given keys. Thus even though the landlord may have made out a prima facie

not the proximate cause of the damage to the house for the freezing of the pipes was not due to lack of fuel. The trial court's holding that appellant should reimburse the owner for

case by showing that the premises had been damaged in a manner inconsistent with ordinary wear and tear, the record reveals that the tenant came forward with uncontroverted proof that the damage was not caused by negligence or misuse on his part. Hence we cannot accept the trial court's conclusion that the damages to the premises were caused by appellant's negligence.

As for the seemingly alternative ground on which the judgment below rested—the failure of the tenant upon the expiration of his lease to "surrender the premises . . . in good, clean and operating condition"—we disagree with the trial court's holding that the only exception to this obligation (set forth in the 9th covenant in the written lease was with respect to conditions attributable to "ordinary wear and tear." As we have already observed, the tenant surrendered the premises with the acquiescence of the owner's agent long before the water damage occurred but even if this covenant should be given some weight, it should be read in light of limitations set forth in another covenant in the same instrument (numbered 12) which relieves the tenant of liability for partial destruction or damage due to ". . . fire, act of God, act of rioters or public enemies or *accident.* . . ." (Italics supplied.) In short, an examination of the two clauses in combination points to the conclusion that the tenant would be accountable only for damage to the premises which could have been prevented by the exercise of reasonable care on the part of the occupant of the house. *See* United States v. Bostwick, 94 U.S. 53, 24 L.Ed. 65 (1877).

Reversed in part and remanded for the entry of a judgment consistent with this opinion.

payment of the fuel bill, however, should stand, as his request that the vacant house be relet contemplated its being kept in comfortable condition.