James DAVEY, et al., Appellants/Cross–Appellees.

v.

H. Hampton KING, Appellee/Cross–Appellant.

Nos. 89–1532, 90–468.

District of Columbia Court of Appeals.

Argued Feb. 4, 1991.
Decided Aug. 21, 1991.

Eric M. Rome, Washington, D.C., for appellants/cross-appellees.

Michael L. Sibarium, for appellee/cross-appellant. Thomas M. Buchanan, and Neil J. Welch, Jr., Washington, D.C., were on the brief.

Before STEADMAN and WAGNER, Associate Judges, and KERN, Senior Judge.

KERN, Senior Judge:

These cross-appeals are from the trial court's determination of a dispute between former friends and colleagues over the ownership of five Washington Redskins season tickets purchased by one of the principals, Mr. King, and used for some 25 years by both him and the other principal to the dispute, Mr. Gast.[1]

Our decision in *Tauber v. Jacobson*, 293 A.2d 861 (D.C.1972), governs this dispute.[2] There, we decided "[a] disagreement among friends over their respective rights to season tickets for the local professional football games [culminating] ... in a lawsuit, a trial, and a judgment requiring the purchaser of the tickets, some four in number, to transfer to plaintiffs his option to renew his subscription in future seasons for two of these tickets." *Id.* at 862.

Here, King had purchased, over the years, a total of five tickets and the trial court, after a trial without a jury, entered an order which is the subject of these cross-appeals. The trial court's ruling was that "the original three tickets in Section 231 ... were at all times the sole property of King ... [but] with respect to the two tickets in Section 227 ... King and Gast/Kraynack are equal owners ... [and] shall have the right to assign or devise their ownership interests in the tickets," and "[i]f a party dies without a will, ownership interest may also pass by intestate succession." We affirm the trial court's ruling with respect to the three tickets but reverse its ruling as to the other two tickets.

I

The record reflects that King purchased three season tickets (the so-called Section 231 tickets) during the 1950's before he even knew Gast. King concluded that because of his other recreational and family activities, he could not use *all* of these tickets for *every* home game but he could not afford to give them away or simply not use them. Therefore, he asked Gast, a friend and co-worker, if he wished to use some of these tickets upon payment to King of their face amount. Gast agreed. However, it developed that Gast could not, by himself, use all the tickets made available to him by King. Accordingly, Gast asked others, including Kraynack and Davey, to join in this sharing arrangement with the understanding that they would pay King for the tickets each year. In the meantime, King shared the tickets to the home games that he did retain with his family and other friends.

King and Gast established a somewhat elaborate system of "teams" of users of the tickets King purchased each year and which were always registered at the Redskins ticket office in his name.[3] At no time, according to the testimony, did King say that any user of the tickets he renewed (and purchased) annually had an ownership interest in such tickets. Also, none of those who used the tickets upon payment of their face amount ever requested that such ticket or tickets be re-registered in a name other than King. The sharing arrangement by "teams" was never formalized in writing.

---

1. Mr. Gast was joined in this litigation by other parties who shared Mr. King's season tickets.

2. We are not persuaded by Gast's argument that the minor factual differences between this case and *Tauber* enable us to distinguish the former from the latter and thereby avoid its binding precedent.

3. King would each year order and pay for renewal of his season tickets and then advise Gast of the amount to pay him. Thereafter, King testified, "We would get together to decide ... which of the home games we would see ... we would alternate, whoever had the first choice on a particular year, then the other group would have the second choice...."

In the 1960's, King decided he wanted to seize the opportunity presented to him to purchase two more season tickets for his own enjoyment and that of family and friends. The record contains testimony by Mr. King that *he* determined "to increase my tickets in the Redskins as an activity among our friends and the family," and that he "needed to find people that were interested in buying them from me." Mr. King further testified that he would have had no difficulty in finding persons to buy the two additional tickets from him, but Mr. Gast "was the first one to say, well, I'll take half of them so I said okay." Mr. King pointed out "that the benefit of having somebody like this [Mr. Gast], [was] you don't have to go hunting around for people to buy tickets. It's nice to have someone available."

Mr. Gast in his testimony acknowledged that when Mr. King called him concerning the addition of two tickets nothing was said about his "having any ownership rights to them." Mr. Gast recalled that Mr. King had advised that he had an opportunity to add two tickets "to the three that we already were sharing. That if I were interested and could get others in my group and wished to do so, he would go ahead and purchase them."

Mr. Gast acknowledged in his testimony that he, by himself, could not use all of the original three tickets he shared with Mr. King, and so he had "added two other individuals to go with me ... on those three tickets." When Mr. King proceeded to purchase the two additional tickets, he testified that "[w]e added one more person to the group that shared the tickets we then had." [4]

Prior to the beginning of the 1988 Redskins season, King advised Gast that "he wanted to pull back two of his tickets for that year" because of a desire to have additional members of his family enjoy the tickets. Gast testified that he was "dismayed" and "somewhat shocked" by this turn of events, believing that he had an ownership interest "based on 25 years of use." He thereupon filed suit for breach of contract and for the imposition of a constructive trust over the tickets he was using under the sharing arrangement.

## II

■ The trial court, in our view, correctly concluded that Gast had no ownership interest in the three tickets King purchased before he even knew Gast. Accordingly, we affirm this part of the court's ruling.[5] However, the conscientious trial judge went on to find "that King would not have purchased ... [the other two] tickets but for the agreement of plaintiffs Gast and Kraynack to share them equally." Thus, the court found that, as a matter of law, King was acting as an agent for Gast and Kraynack when he purchased those tickets. "Therefore, even though King is listed with the Washington Redskins ticket office as the sole owner of those tickets, said ownership is held in constructive trust for the equal use, enjoyment and benefit of Gast and Kraynack."

■ We look first to the trial court's finding that an agency relationship was established. In *Tauber* we acknowledged that under certain circumstances an implied agency is created. *See Tauber, supra,* 293 A.2d at 865. There we stated:

[W]e would have no hesitation in holding that in any year in which Tauber called his friends and requested them to forward their share of the deposit if they wished to attend the games with him during the coming season, he thereby made himself their agent and was bound when the tickets were ultimately delivered to turn them over. Such holding would seem to follow from Tauber's invi-

---

4. The record reflects that the members of the group sharing the tickets changed over the years, suggesting that the individuals involved did not consider themselves owners of the tickets.

5. The trial court rested its conclusion upon its finding "that those tickets were purchased by King ... without plaintiffs' participation, and any sharing arrangement thereafter was gratuitous and therefore conferred no ownership interests on plaintiffs." There was substantial evidence to support such finding.

tation to the plaintiffs, described by one of them (Jacobson) as "asking me to do the same thing for a number of years."

*Id.* This court went on to state in *Tauber:*

The trial court, however, has gone much further by holding in effect that in every subsequent year when Tauber exercised his renewal season ticket privileges, he was bound to treat two of the tickets as the property of the plaintiffs. This holding could be supported if the record showed that (a) in 1961, Tauber bought two of these tickets only because he was authorized by Racoosin to act as the latter's agent, or (b) the parties entered into a contract committing Tauber always to offer one ticket to each of the plaintiffs at cost, or in the alternative to make permanent transfer of his subscription option to them.

*Id.*

In the instant case, it is undisputed that the parties never entered into a contract committing King always to offer tickets annually to each of the plaintiffs, including Gast. Nor do we discern in the record any evidence that when King bought the additional two season tickets, he did so only acting as Gast's agent and under authority and direction by Gast. Indeed, there is nothing in the evidence to indicate that King was ever Gast's agent. The trial court found, "[w]hen Mr. King purchased them [the two tickets], he purchased them really on the strength of Mr. Gast's desire to have them. So, I find that there was an agency relationship, by conduct of the parties...." However, Gast testified that, although his "impression" was that King "would not have purchased them [the two additional tickets] unless he had found somebody else to go with him," he conceded that King never so stated to him. On the other hand, King testified that he "determined to increase his season tickets from three to five in number as an activity ... among our friends and family."

The hallmark of an agency relationship is that the agent takes action on behalf of the principal and subjects himself to the orders of the principal. *See Henderson v. Charles E. Smith Management,* 567 A.2d 59, 62 (D.C.1989); *Smith v. Jenkins,* 452 A.2d 333, 335 (D.C.1982); RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958). We have held that an agency relationship is established "when one person authorizes another to act on his behalf subject to his control, and the other consents to do so." *Henderson, supra,* 567 A.2d at 62 (citing *Rose v. Silver,* 394 A.2d 1368, 1371 (D.C.1978)). The evidence does not show that the parties consented to establish an agency relationship nor does it support a finding that Davey retained the power or the right to control King's actions. *Id.* at 62 n. 5.

The record does reflect, however, that King took action to increase the number of his tickets for his own benefit, and that he assured that the "same practice" he and Gast had been following with respect to the three tickets would continue to be followed with respect to the five tickets. Thus, even Gast testified that King had asked him "would I be interested and would I be able to assist him in purchasing those and sharing those *as we'd done the first three."* Gast further testified that he would and they did "[e]ssentially the same thing. We added one more person to the group that shared the tickets we then had.... But insofar as selecting the games to attend [and] paying for the tickets annually, it all remained the same...." Moreover, it was within King's control, and his control only, to exercise his option to purchase the tickets each year.

Under the particular circumstances in this case, we are impelled to reach the same conclusion with respect to the trial court's decision here as did this court reviewing the trial court's conclusion in *Tauber:*

After reviewing the testimony in this record, however, we have difficulty in accepting the court's reasoning. In view of the admittedly gratuitous character of Tauber's commitment to his erstwhile football companions, the court's holding to be supported must rest on some principle of promissory estoppel, reflected in the obligations imposed even upon voluntary and uncompensated agents, where

the promisee relies to his detriment upon such persons.

*Tauber, supra,* 293 A.2d at 865.

This court in *Tauber* expressly rejected the gravamen of the claim that Gast makes in the instant case: that prolonged use of the tickets owned by another produced an ownership interest, despite the absence of any agreement to this effect. *Id.* at 867. Specifically, this court in *Tauber* rejected the contention that the "course of conduct [by the ticket holder] over the years created an implied agency amounting to a constructive trust."[6] We agree with the conclusion in *Tauber* that "this [the trial court's ruling] goes far beyond any doctrine of promissory estoppel as reflected in the law of gratuitous agency. *Id.* Where the promisor causes another to change his position to his detriment in reliance on the promise or course of conduct, we will find a gratuitous agency relationship. *See Franklin Investment Co. v. Huffman,* 393 A.2d 119, 122 (D.C.1978); RESTATEMENT (SECOND) OF AGENCY § 378 (1958). There is no evidence that Gast and the others altered their position as a result of King's actions.[7] "It is well established that mere expectancy of a continued course of conduct is not enough, even in situations where the disappointment of expectations results in heavy financial loss." *Tauber, supra,* 293 A.2d at 867.

Accordingly, the trial court's determination in favor of King with respect to the three tickets in Section 231 is affirmed. The trial court's determination in favor of Gast with respect to the two tickets in Section 227 is reversed and that part of the order implementing such determination is vacated and King's rights to these two tickets is restored.[8]

*So ordered.*

6. Gast points to our decision in *Gray v. Gray,* 412 A.2d 1208 (D.C.1980), as support for the proposition that a constructive trust could be properly imposed in perpetuity upon the right of King, as a season ticket holder, to renew his two season tickets in Section 227. "A constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if permitted to retain it." *Id.* at 1210 (citations omitted).

Such a result would be justified only if King had accepted direction from Gast to buy the two tickets, one for himself, and the other for Gast, but then wrongfully appropriated to his own use both tickets. However, there is no evidence that Gast directed King to purchase either ticket for himself alone. Rather, King added to his pool

of tickets upon assurance that Gast *and others* would pay for the cost of some of them each year, exactly as had been their practice for the prior years with respect to the three tickets in Section 231.

7. Gast alleges that he refrained from having the tickets registered in his name because of King's offer to share them. We are not persuaded by this argument where there is no evidence that anyone but King was able to purchase them under the rules of the Washington Redskins.

8. Because we do not find an agency relationship with regard to the two tickets, we need not address the issue of the validity of a constructive trust as a remedy in circumstances where an implied agency is found.