| 8 | 1 |
|---|---|
| 8 | 56 |
| 8 | 1 |
| 13 | 58 |
| 8 | 1 |
| 18 | 543 |
| 8 | 1 |
| 3a | 358 |
| 8 | 1 |
| 7a | 193 |
| 8 | 1 |
| 26 | 248 |
| 8 | 1 |
| 15a | 160 |
| 15a | 481 |
| 8 | 1 |
| 19a | 439 |
| 8 | 1 |
| 37 | 297 |

## DENVER, SOUTH PARK & PACIFIC R. R. CO. v. CONWAY.

1. Artificial, like natural persons, are liable in damages for acts of negligence imputable to them, whereby injuries result to third persons. A corporation acts through its officers and employees, who, in the exercise of their respective functions, and to that extent, represent the corporation.
2. The rules and principles of law applicable to the relation of master and servant apply equally to corporations and their agents, and damages resulting from the negligence of both classes of persons are measured by the same rule.
3. The rule is well settled that notice to an agent in transactions in which he is employed, where it becomes his duty, by virtue of his employment, to act on such notice, is notice to the principal.
4. Courts are not required to state, in their instructions to juries, the entire law upon any given subject, but only so much thereof as may be applicable and essential to the issues and facts of the case on trial. To this extent the charge must be correct and explicit, and if unexceptionable in these essentials it will not be ground of reversal that the instructions are not strictly correct as universal propositions of law.

Courts do not sit as literary critics, and therefore mere verbal inaccuracies, unless clearly shown to have been misleading, are not ground of reversal.

VOL. VIII — 1

5. Interest in this state is a creature of statute and regulated thereby. It is only recoverable, in the absence of contract, in the cases enumerated in the statute, and damages to property arising from the wrong or negligence of a defendant is not one of the enumerated cases.

*Appeal from District Court of Park County.*

THE facts are stated in the opinion.

Messrs. TELLER and ORAHOOD, for appellant.

Mr. JOHN W. HORNER, for appellee.

BECK, C. J.   The appeal is from a judgment rendered against the defendant below, the Denver, South Park & Pacific Railroad Company, for damages to the property and person of the plaintiff, occasioned by the burning of a depot building belonging to the defendant, and the explosion of a quantity of giant cartridges therein contained.

The complaint, as it remained after demurrer sustained thereto, contained three separate claims for damages alleged to have occurred to the plaintiff by reason of the negligence of the defendant.

It alleges that on the 14th day of August, 1880, the defendant owned and operated a railroad from Denver to and through the town of Red Hill, in Park county, Colorado.   That it also owned and used a certain depot building in the latter place which contained a defective flue.   That a pipe from a stove in said building passed into and through this flue, rendering the building extremely unsafe and liable at any time to take fire.

The complaint further alleges that the plaintiff owned a certain saloon building, together with the contents thereof, which was situated about thirty-five feet distant from the defendant's depot building; that the plaintiff also occupied, as proprietor thereof, a certain hotel building, situated about forty-five feet from said depot building.

The acts of negligence complained of are, that the defendant, knowing that the flue in said building was in a very defective condition, which rendered the building extremely unsafe, and liable at any time to take fire; and well knowing that the property of the plaintiff was in close proximity thereto, carelessly, negligently and wrongfully stored giant powder and explosive caps (the latter being used to explode the powder) in said building, and while said explosives were so stored therein, caused a fire to be made in the stove having the defective flue, by reason whereof the building was burned, resulting in an explosion which destroyed the plaintiff's property, and seriously injured him personally. Damages are claimed for the loss of saloon building and contents in the sum of $1,038; for chattels destroyed in the hotel, in the sum of $63, and for injuries to the plaintiff's person in the sum of $5,000. Judgment is demanded for said several sums, together with interest thereon, from the 14th day of August, 1880 (the time of the fire), at the rate of ten per cent. per annum.

The answer of the railroad company denies all the allegations of the complaint, including specific denials of the causes which led to the burning of the building and the disasters which followed.

The cause was tried to a jury, who returned a verdict for the plaintiff of $2,250, upon which the court ordered judgment.

The errors assigned and relied upon relate to instructions of the court to the jury, and to the allowance of interest upon the value of the property destroyed. The *first* and *second* errors assigned are upon the first instruction. That portion of the instruction assigned for error is in the following words:  *  *  *  "That if they believe from the evidence that defendant had a depot building at Red Hill, at and prior to August 14, 1880, and stored therein prior to said August 14, 1880, and from thence until August 14, 1880, kept therein stored, a large

quantity of atlas powder, commonly known as giant
cartridges; and that said depot building was near the
property of the plaintiff, and during all the time said
powder was therein, said depot building was in a defect-
ive condition and liable to take fire from a fire kept in a
stove in said building, of which defendant had notice,
and that, by reason of the carelessness and negligence of
defendant, said building was burned, and the burning of
said building caused said powder to explode, and, by fire
or otherwise, destroy the property of the plaintiff, they
should find for the plaintiff."

Counsel say: "Our objections to the instruction are
that it was a departure from the issue in the case made
by the pleadings, and allowed the jury to find a verdict
on a state of case not at all presented by the pleadings,
and to wander about through the evidence for some de-
fect in the building itself, not relied on in the complaint,
and found a verdict upon matter wholly foreign to the
real issue made in the case by the parties to it." Coun-
sel insist, throughout their entire argument, that the spe-
cific allegation of the complaint as to the origin and
cause of the fire, namely, a defective flue, was aban-
doned on the trial; that there was no evidence to support
the allegation, and that the court, by its instructions to
the jury, permitted the plaintiff to depart from the issue
presented by the pleadings and to rest the claim for dam-
ages upon a wholly different element of liability, viz.,
a defective condition of the depot building. This, they
say, was a change of the cause of action, after the intro-
duction of the testimony, and was therefore prejudicial
to the rights of the defendant. They characterize the
action of the court as giving to the jury, by its instruc-
tions, a roving commission to wander about through the
evidence and find a verdict upon matter wholly foreign
to the case.

A patient examination of the voluminous record in the
case has satisfied us that these charges are specious and

technical. The sum total of these objections is, that the jury were told if they believed from the evidence that the depot building was in a defective condition and liable to take fire from a fire kept in a stove in the building, and, knowing the fact, the defendant stored a large quantity of giant cartridges therein, and that by the carelessness and negligence of the defendant the depot was burned, the powder exploded and the plaintiff damaged, they should find a verdict in his favor, instead of being told that to warrant a verdict for the plaintiff they must find that the fire originated from a *defective flue.*

The only foundation that we can discover for the objections so strenuously urged upon our attention lies in the definition of the word "*flue.*" The complaint declares *in hæc verba* "*that the depot building was extremely unsafe and liable at any time to take fire,*" but in a previous sentence the cause of its unsafe condition is attributed to a "*defective flue.*"

Now if there was any variance in the proof from the allegations of the complaint, it was that the *locus* or thing referred to in the complaint as *defective* was not, strictly speaking, a *flue*, but an aperture not protected by a flue, through which the stovepipe passed. Instead of there being a defective flue, in the technical sense of the term, the defective condition of the building was owing to the *absence* of a flue at the point referred to. But we think this point was described with reasonable certainty, and find nothing in the entire proceedings to indicate that any one was misled by the misapplication of the term. In support of this conclusion we cite the fact that the witnesses of both parties, including the agents and officers of the defendant company, referred to and denominated the alleged defective point as a flue, in their testimony. The complaint states that the pipe from the stove passed into and through it, and that a fire was made and kept in the stove, thereby rendering the building unsafe. The testimony showed conclusively that the

fire originated in the apartment of the building called the "office," that the ceiling over this room was composed of dressed boards of a single thickness, and that the pipe from the stove passed up through a hole in this board ceiling, and up through the roof. The only protection provided to prevent the pipe from coming in contact with the boards of the ceiling was a small sheet of tin or zinc, through which the pipe was passed, and which was placed on the upper surface of the ceiling boards. The same provision existed at the point where the pipe passed through the roof.

The testimony further shows that on the night of the disaster a hot fire was made in the office stove in the presence of and with the knowledge of the defendant's station agent in charge of said station and building, who thereupon retired to bed in said office room. By reason of this fire and the so-called defective flue, the ceiling around the stovepipe was ignited, and fire communicated to the entire building, causing its total destruction, the explosion of the powder and the damages to person and property sued for.

Now, while it must be conceded that the phraseology of the complaint is liable to verbal criticism in the particular mentioned, yet the meaning is so apparent that no prejudice could have resulted therefrom, since no one could have been misled by the term employed. The evidence also abundantly shows that the defect in the building complained of was of the most dangerous character, and was the proximate cause of the fire. It is not contended in argument that the fire originated at any other point or through other means, and, if it was, we discover no evidence to support such a theory. It would seem, then, that the objections which we have been considering are pure technicalities, which fairly fall within the class defined as "curious and nice exceptions tending to the overthrow or delay of justice," which, it has been well said, a proper construction of the law always disallows.

Courts do not sit as literary critics, and therefore mere verbal inaccuracies, unless clearly shown to have been misleading, are not ground of reversal.

Portions of the second and third instructions are assigned for error as follows:

"Second. If they believe, from the evidence, that, on and prior to the 14th of August, 1880, the defendant had a depot at Red Hill, near plaintiff's property, that was in a defective condition and liable to take fire from a fire kept therein, and that, knowing the premises, a few days prior to said 14th day of August, 1880, defendant stored in said building a large quantity of atlas powder, commonly known as giant cartridges, and kept the same therein, and while it was stored therein said building took fire through a lack of the care and diligence above described on the part of the defendant, by and through its agents and employees, and caused said powder to explode and destroy by fire or otherwise the property of the plaintiff, they should find for plaintiff."

"Third. And if the jury find, from the evidence, that the defendant stored and kept in the depot at Red Hill giant powder or cartridges, or other inflammable and combustible materials, when said depot building was defective and unsafe for the storage and keeping of such materials, and that defendant was aware of such facts, or that it did not keep the same with the vigilance and care, and in the charge of such careful and proper servants, as a prudent man would have done with the same kind of substances, and that, by reason thereof, the said depot building was burned, and the said giant powder and other substances exploded and destroyed the property of plaintiff by fire or otherwise, they should find for the plaintiff."

The objections assigned to these instructions are, that there was no evidence produced by the plaintiff that said depot building was defective and liable to take fire from a fire kept therein; nor any evidence that it was unsafe

for the storage and keeping of such materials as therein described; nor any evidence that the defendant was aware of such facts; that there was no allegation in the complaint nor any evidence produced on that trial that said defendant did not keep said depot with vigilance and care, and in charge of such careful and proper servants as a prudent man would have done, and that by reason thereof the building was burned, the powder exploded and the plaintiff's property destroyed.

It is also assigned for error that the court instructed the jury that notice to defendant's agents was notice to the defendant, and that the acts of its agents and employees were the acts of the defendant.

The objections to these legal propositions are, that they are too broad, and consequently that they were calculated to mislead the jury; also, that there was no evidence to support them.

The foregoing objections embrace the *fourth*, *fifth*, sixth, seventh, *ninth* and fifteenth assignments of error.

We will first consider the objections to the legal propositions contained in the foregoing instructions.

Respecting the acts and responsibilities of corporations, the law is that artificial persons, like natural persons, are liable in damages for acts of negligence imputable to them, whereby injuries result to third persons. A corporation acts through its officers and employees, who, in the exercise of their respective functions, and to that extent, represent the corporation.

The rules and principles of law applicable to the relation of master and servant apply equally to corporations and their agents, and damages resulting from the negligence of both classes of persons is measured by the same rule.

If a servant is guilty of a wrongful act when engaged in his master's business and while acting within the general scope of his authority, the master is liable although he did not authorize the particular act. It is no defense

in such case that the servant disobeyed private instructions, or abused his authority. So a person who puts a servant in a place of trust or responsibility, or commits to him the management of his business, or the care of his property, is held responsible for damages resulting to third persons through the lack of judgment or discretion of the servant, while executing the trust, although he departed from the strict letter of his authority in the execution thereof.

The same rules obtain in respect to railroad companies. Accordingly it is laid down that the employees of such a corporation, both of the higher and the subordinate class, who are engaged in service at its stations, or on its trains, are presumed to be authorized by it to do such service, and to perform the acts usually incident to their positions; and it is liable for their tortious acts which are performed in the course of such service. *Rounds v. D. L. & W. R. Co.* 64 N. Y. 129; *Cohen v. Railroad Company,* 69 N. Y. 170; *Passenger Railway Company v. Donahue,* 70 Pa. St. 119; Pierce on Railroads, 277.

Concerning the question of notice, the rule is the same in respect to corporations as to natural persons. As to the latter, the principle obtains that wilful ignorance of a fact is equivalent to actual knowledge of the fact.

The rule is well settled that notice to an agent in transactions in which he is employed, where it becomes his duty, by virtue of his employment, to act on such notice, is notice to the principal. The term *notice*, in such instance, is synonymous with the term *knowledge*.

It may therefore be said that knowledge acquired by agents of corporations, in the discharge of official duties, of facts material to the transactions in which they are engaged, or coming within their respective departments of service, is the knowledge of the corporation. Ewell's Evans on Agents, p. 229; Angell & Ames on Corporations, sec. 305; Abbott's Digest Law of Corporations, pp. 543, 544. An illustration of the rule that notice to the

agent in the transactions in which he is employed, and within the scope of the authority confided to him, is notice to the principal, is found in the case of a locomotive engineer, wherein it is held that, if the fact be known to him that either the road or the machinery is defective, it is knowledge on the part of the company, and renders it responsible for the consequences. *N. & C. R. R. Co. v. Elliott*, 1 Cold. 611.

It will be observed that the rules above stated concerning the responsibilities of corporations growing out of the acts of their agents, and concerning notice to their agents, are more full and guarded upon these subjects than the legal propositions of the instructions upon the same subjects. This fact requires us to notice an important rule of practice. It is this: That courts are not required to state, in their instructions to juries, the entire law upon any given subject, but only so much thereof as may be applicable and essential to the issues and facts of the case on trial. To this extent the charge must be correct and explicit, and if unexceptionable in these essentials it will not be ground of reversal that the instructions are not strictly correct as universal propositions of law. Proffatt on Jury Trial, secs. 311, 313; Wells' Questions of Law and Fact, secs. 393, 403.

The instructions were correct, therefore, if applicable to the case. But counsel affirm that they were neither applicable to the issues nor based upon the evidence.

What, then, were the issues, and what was the effect of the evidence?

The complaint explicitly charged that the injuries and damages sustained by the plaintiff were occasioned by the wrongful and negligent acts of the defendant. It specified in what the wrong and negligence consisted, and likewise the nature and extent of the damages sustained.

The answer as explicitly denied that the defendant was guilty of wrong or negligence; denied that the

fire and its consequences were the result of wrong or negligence on its part; and denied, *seriatim*, the specific acts of negligence alleged to have been sustained by the plaintiff. It further denied that the defendant had any notice or knowledge of the alleged negligent or wrongful acts.

So far, then, as the *issues* were concerned, the instructions were applicable under the rules and principles announced.

Upon looking into the evidence we learn that the depot building was a wooden structure, of the dimensions of about twenty-four feet by thirty-six feet, erected upon upright blocks of wood, which elevated the side nearest the railroad about eighteen inches above the ground, and the opposite side about three feet above the ground. The ends and sides of the building were composed of single boards placed upright against the frame timbers, the edges or cracks of the boards being battened with narrower strips of lumber. The roof was a steep gable, constructed of boards, which were battened like the ends and sides, and the exterior surface was covered with tarred paper, to protect the interior from snow and rain. The interior was divided into four rooms and a loft, the rooms being named respectively, "office," "waiting room," "warehouse" and "kitchen." These apartments, or some of them, including the office, were separated from the loft by a board ceiling, which has already been described, as has also the aperture therein through which the pipe of the office stove passed.

That this building was the property of the railroad company is not denied; that the company caused it to be constructed and equipped in manner described was proven by the witnesses.

C. W. Fisher, superintendent of the defendant, stated upon the witness stand that the building was constructed for the company upon contract; that it was his business to inspect the building and property of the company, and

that on the completion of the depot he inspected it, found it all right and received it.

When asked about the condition of the defective flue in the office ceiling, he answered that he did not remember of giving special attention to the flue; he was under the impression that the flues were all right. He said it was his special duty to see that such things were safe; that he went there to examine and found them all right. He was unable to say, however, whether there was a flue in the office ceiling or not, at the time of his inspection, but admitted that the furnishing of flues for the building was not included in the contract. He then stated that an employee of the railroad company known as "foreman of buildings," by name of John Greenslit, was to look after the flues. Mr. Greenslit being called to the stand and asked if he knew anything about a flue in the office ceiling, answered that he did not. He said he had furnished but one flue, and that went into the waiting room; he had put none in the office.

The testimony shows there were three stoves in use in this building, but we have here the remarkable admission that but one flue was provided, and that was not for the office, where it seems fire was necessary at all seasons, but for the waiting room.

The testimony further shows that from the completion of the building to the time of the fire, this depot station was in the general charge of one F. E. Colyer, as station agent and telegraph operator of the defendant. The only other employee of the defendant at that point, at and about the time of the fire, was one Charles Hilton, who appears to have been employed as an assistant to the agent, Colyer. Mr. Rundle, the defendant's superintendent of telegraphs, says he authorized Colyer to employ Hilton for the business of checking tracking freight at the station. But the testimony shows that in the absence of Colyer, Hilton ran the station, excepting only the telegraph instrument. These two men, Colyer and

Hilton, slept together in a bed in the office, and were sleeping there when the fire occurred. The weather was cool in the evenings, at that point, rendering it necessary to have fire in the office stove almost every night, although it was in the month of August. On the night of the 13th of August, there was a fire in the stove, and as these men were about to retire to bed, the stove was filled up with coal, more than the usual quantity being put in, according to the testimony of Colyer. They were awakened about 12 o'clock in the night, by the fire, which had been communicated to the ceiling, and had gained such headway that they could do nothing but escape from the building, which was soon destroyed.

Two or three weeks before this the station agent was alarmed by a fire on the ceiling at the same point. It appears that some chips had been left there by the carpenter when constructing the building, and that they were ignited by the heat of the stovepipe. This fire was extinguished by the agent, with the assistance of other persons, by means of a bucket of water, but no precautions were taken to prevent a recurrence, save to brush back the chips. The occurrence is mentioned by the witnesses as creating quite a "scare" at the time.

As to the contents of the building on the night of the final conflagration, witnesses testified that there were about twenty cases of giant powder, or giant cartridges, in the freight room, weighing fifty pounds to the case; also, a considerable quantity of coal oil in the immediate vicinity.

Testimony was introduced as to the explosive and dangerous nature of giant powder, and as to what agencies would cause it to explode.

The facts of the fire and explosion, the situation of the plaintiff and his property, and the effects produced by the disaster, were all proven.

In view of the issues and the testimony, then, we have no hesitation in pronouncing the instructions both correct and applicable to the case presented to the jury.

Concerning the unsafe condition of the building in respect to fire, the testimony was confined to the so-called defective flue, showing wherein it was defective; also, that the fire which destroyed the building originated at this point, and that it was communicated from the fire in the office stove, by means of the stovepipe, which passed through the defective flue. The reference in the instructions, then, to the unsafe condition of the building, and its liability to take fire from a fire kept therein, could not have been misunderstood by the jury.

Appellant's counsel think the previous fire without significance on the question of a defective flue. They say the ceiling did not ignite on the occasion, but only the chips against the stove-pipe. But the witness Colyer said, when asked if he saw where the fire was when he poured on the water, "Yes, sir, the chips and the ceiling were also burnt."

This testimony was received without objection, and we think it was proper matter for the consideration of the jury on the question of negligence. It showed that the special attention of the defendant's agents was called to the condition of this flue, or stovepipe passage, before the storing of the explosive materials in the building. It was a notice to the defendant's agent, and through him to the defendant itself, not only of the condition of the flue, but of the degree of heat generated by the stovepipe, and the danger, great or small, of a fire originating at this point.

This agent being in charge of the company's property and business at this station, the rule applies that knowledge acquired by agents of corporations of facts coming within their respective departments of service is the knowledge of the corporation.

On the question of notice, it further appeared that officers of the company whose special duty it was to inspect this building, and to see that necessary flues were provided and put in, neglected that duty. The agent in charge of the building knew from a personal inspection, and from

the warning of a previous fire, that the so-called flue was defective and dangerous.    Within the principles announced, then, all these agents were chargeable with knowledge of the dangerous condition of the building. This knowledge being acquired within the course of their several employments, it was their duty to communicate it to the company, and, in law, the knowledge of these agents was the knowledge of the company.    In the language of the instructions, notice to these agents was notice to the company.

This disposes of the objection that the "instructions sanction a notice to any brakeman or laborer in the service of the company."    The notices proved were to the officers and employees who were duly authorized by virtue of their offices, and the scope of their employment, to represent the company in these identical matters, and not to brakemen or laborers.

Lastly, under the rules of law before stated, the shipping of the giant cartridges to this depot; the depositing of them in the building, and the making of the fire in the office stove, were each and all of them the acts of the defendant.

These, and the failure to provide a sufficient flue, being the acts complained of, and it being shown that they were all committed by agents of the company in the course of their employment, and within the scope of the authority confided to them, the court properly said of them in its instructions — "the acts of its agents and employees were the acts of the defendant."

The question whether the acts complained of constituted negligence was a question for the jury to decide, and was so left.    We think their finding was fully warranted.

The remaining errors assigned relate to the allowance of interest on the value of the property destroyed.    The court instructed the jury that, if they found a verdict for the plaintiff, they should assess his damages at the value

of the property destroyed, with interest thereon at the rate of ten per centum per annum from the time it was so destroyed.

Interest in this state is a creature of statute and regulated thereby. It is only recoverable, in the absence of contract, in the cases enumerated in the statute, and damages to property arising from the wrong or negligence of a defendant is not one of the enumerated cases.

The statute is set out and construed in *Hawly v. Barker*, 5 Colo. 118, where it was held that interest was not recoverable on the amount of a *verdict*, although a period of nearly two years had elapsed from the date of its rendition up to the time of the entry of judgment thereon.

For adjudications upon similar statutory provisions, see *I. C. R. R. Co. v. Cobb et al.* 72 Ill. 148; *City of Chicago v. Allcock*, 86 Ill. 384; *Atkinson v. A. & P. R. R. Co.* 63 Mo. 367; *Kenney v. H. & St. J. R. R.* id. 99. The instructions were erroneous in this particular, and since it is to be presumed that the jury obeyed them and computed interest, at the rate mentioned, on the value of the property destroyed by the explosion, from the date of its destruction to the date of verdict, the judgment must be reversed for this error. But it will not be necessary to remand the cause for a new trial on account of this single error. It is true that interest was only given upon the value of the property destroyed, and not upon the damages assessed for personal injuries; also that we have no means of ascertaining the amount of the sum upon which interest was allowed. But the plaintiff consents to remit from his judgment a sum equivalent to the interest on the total amount of his damages, which not only cures the error, but is more favorable to the defendant.

Interest upon the entire amount of damages from August 14, 1880, the date of the fire, to May 3, 1881, the date of the judgment, would amount to the sum of $151.

Deducting this sum from $2,250, the amount of the judg-
ment, leaves as the true amount for which judgment
should be entered the sum of $2,099.

It is therefore ordered that the judgment of the district
court be reversed, and that judgment be entered herein
in favor of the appellee for the sum of $2,099, and for
costs in the district court as taxed.   It is further ordered
that appellee pay the costs in this court to be taxed.

*Reversed.*