Odell R. STORTROEN and Kathy E. Stortroen, Petitioners,

v.

BENEFICIAL FINANCE CO. OF COLORADO, Carol Ann Carelli and Eugene L. Carelli, Respondents.

No. 86SC106.

Supreme Court of Colorado, En Banc.

April 27, 1987.

392

John S. Kellogg, Denver, for petitioners.

Grant, McHendrie, Haines and Crouse, P.C., Charles H. Haines, Jr., Denver, for respondent Beneficial Finance Co.

Richard E. Mishkin, P.C., Richard E. Mishkin, Denver, for respondents Carol Ann Carelli and Eugene Carelli.

Robert D. Butters, Chicago, for amicus curiae National Ass'n of Realtors.

Gorsuch, Kirgis, Campbell, Walker and Grover, John L. Ferguson, Denver, for amici curiae National Ass'n of Realtors and Colorado Ass'n of Realtors.

QUINN, Chief Justice.

We granted certiorari under C.A.R. 50 [1] to review a decision of the District Court of Jefferson County, which entered a summary judgment in favor of the defendant-respondent, Beneficial Finance Company, the owner of a home that was offered for sale through a real estate broker who listed the property with a multiple listing service, and against the plaintiffs, Odell R. and Kathy E. Stortroen, who were the putative purchasers of the home. The district court held that a principal-agent relationship existed between the purchasers and the selling (or "cooperating") broker in connection with the sale and that the purchasers' act of notifying the selling broker's associate of the acceptance of the seller's counteroffer did not constitute notice to the sellers of the acceptance. We hold that in a multiple listing real estate transaction involving residential property the selling broker or salesperson, in the absence of a written agreement creating a different agency relationship, is an agent of the listing broker and, as such, is within a chain of agency to the seller. We accordingly reverse the summary judgment and remand the case to the district court for further proceedings.

I.

The Stortroens and Beneficial Finance Company (Beneficial) stipulated to the following chronology of events. The Stortroens wished to sell their home at 4270 Stuart Street in Denver and to purchase a larger residence. To accomplish these goals the Stortroens sought the assistance of Mary Panio, a broker-associate with Foremost Realty, which had sold the Stortroens their current home. The Stortroens listed their home for sale with Foremost on November 4, 1983, and relied on Panio to show them a suitable property to buy. In order to find the Stortroens a home Panio consulted a compilation of listings published by Metrolist, Inc., a multiple listing service operated by several boards of realtors in the Denver metropolitan area. Panio learned through the listing book issued by Metrolist that Beneficial had listed for sale with Paul Olthoff, doing business as Olthoff Realty Company, a house at 6927 Quay Court in Arvada. The listing agreement between Beneficial and Olthoff was captioned "Exclusive Right To Sell Listing Contract (Residential)" and provided, in pertinent part, as follows:

> In consideration of the services of the hereinafter named real estate broker, I hereby list with said broker, from Oct. 26, 1983, to March 26, 1983 [sic], inclusive, the property described below and I hereby grant said broker the exclusive and irrevocable right to sell the same within said time at the price and on the terms herein stated, or at such other price and terms which may be accepted by me, and to accept deposits thereon and retain same until the closing of, or

---

1. C.A.R. 50 provides for a writ of certiorari from the supreme court to review a case before judgment is given by the court of appeals upon a showing that the case involves a matter of substance not heretofore decided by the supreme court.

defeat of, the transaction. I further authorize said broker to list the property with any multiple listing service in which he is a participant, at the broker's expense, and to accept the assistance and cooperation of other brokers. I hereby agree to pay said broker 6% of the selling price for his services (1) in case of any sale or exchange of same within said listing period by the undersigned owner, the said broker, or by any person, or (2) upon the said broker finding a purchaser who is ready, willing and able to complete the purchase as proposed by the owner, or (3) in case of any such sale or exchange of said property withing [sic] 120 days subsequent to the expiration of this agreement to any party with whom the said broker negotiated and whose name was disclosed to the owner by the broker during the listing period.

\*     \*     \*     \*     \*     \*

Additional provisions: If Paul Olthoff, personally procures a purchaser for subject property then brokerage fee shall be 4% of purchase price.

If Beneficial Finance procures a purchaser for subject property then the brokerage fee shall be 2% of purchase price.

In January 1984, Panio showed the Stortroens the Quay Court property and assisted them in preparing a written offer to purchase the property for $105,000, of which $1,000 was paid as earnest money. The Stortroens' offer was on a document entitled "Residential Contract to Buy and Sell Real Estate" and designated a closing date of March 26, 1984. The contract was contingent upon the sale and closing of the Stortroens' current home, although it provided that the Quay Court property "may remain on the market and in the event of a successful offer to seller, the purchaser has 72 hours to remove contingency on the sale of their home." Donald Reh, an officer of Beneficial, reviewed the offer with Olthoff and rejected it. Reh drafted a counterproposal offering the property for $110,000. The counterproposal stated: "If this counterproposal is accepted by Purchaser, as evidenced by Purchaser's signature hereon, and if Seller receives notice of

such acceptance on or before 9 P.M. 2–3–84, 1984, the said proposed contract, as amended hereby, shall become a contract between the parties." Beneficial submitted the counterproposal through Olthoff to Panio on February 1, 1984.

In the meantime, Carol Ann and Eugene Carelli, who were defendants and third-party plaintiffs in the district court, were shown the Quay Court property by a licensed real estate salesperson employed by another broker. The Carellis prepared an offer of $112,000 for the property and submitted it to Paul Olthoff, the listing broker, on the afternoon of Friday, February 3, 1984. Olthoff informed Reh, the officer of Beneficial who was dealing with the property, of the higher offer and then instructed Carol Carelli and the real estate salesperson to take the offer directly to Reh's office because of the outstanding counteroffer to the Stortroens. When Reh received the Carelli offer, he phoned Olthoff to tell him that he wanted to accept the higher offer and directed him to withdraw the counteroffer to the Stortroens. At approximately 4:30 p.m. on the afternoon of February 3, Olthoff left telephone messages at Panio's office and residence to the effect that Beneficial had withdrawn the counteroffer. After Olthoff informed Reh that he had left these messages, Reh accepted the Carelli offer in writing.

Panio, who was unaware of the Carelli negotiations with Beneficial, took Beneficial's counteroffer to the Stortroens at their home where the Stortroens signed their acceptance at approximately 4:10 p.m. Panio then brought the signed copy back to her office and discovered the withdrawal message from Olthoff.

At a meeting of the real estate brokers and salespersons at Olthoff's office the following Monday, Panio delivered to Olthoff the counteroffer signed by the Stortroens on February 3, 1984, and a document withdrawing the contingency clause, prepared on February 4, 1984. Although the respective positions of Beneficial, the Stortroens, and the Carellis were discussed, no agreement was reached. The Stortroens subsequently recorded the contract and its modi-

fications with the Jefferson County Clerk and Recorder. The Carellis refused to close the transaction when the title examination revealed a cloud on the title caused by the Stortroens' recordation, and they moved into the property under a month-to-month lease.

On April 26, 1984, the Stortroens filed a complaint in the District Court of Jefferson County against Beneficial and the Carellis, alleging breach of a real estate sales contract and seeking a specific performance decree against Beneficial, money damages at the rate of $45 per day from the designated date of closing, which was March 26, 1984, and an order requiring the Carellis to vacate the Quay Court property. The Carellis cross-claimed against Beneficial and added a third-party complaint against Olthoff.

The Stortroens and Beneficial executed a written stipulation of facts, and each filed motions for summary judgment. The district court concluded that Panio was the agent of the Stortroens and that the Stortroens' delivery of the written acceptance of Beneficial's counterproposal to Panio did not constitute notice of acceptance to Beneficial. As a consequence, the court granted the motion for summary judgment on behalf of Beneficial, and denied the Stortroens' motion for summary judgment. The parties then filed a joint motion with this court, requesting that we grant certiorari under C.A.R. 50 and consider whether under the circumstances of this case the selling broker, Mary Panio, was acting as an agent of the purchasers, the Stortroens, or as an agent of the seller, Beneficial.

## II.

Where, as here, the issue is whether a real estate broker or salesperson is an agent of the seller or the purchaser in connection with the sale of a home, we must turn to basic principles of agency and contract law for necessary guidance.

### A.

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Restatement (Second) of Agency* § 1(1) (1957). The one for whom the action is to be taken is the principal, and the one who is to act is the agent. *Id.* § 1(2) and (3). Agency is thus a legal relation having its source in the mutual consent of the parties. The consensual arrangement may but need not amount to a contract. *Id.* § 1 comment b. Furthermore, an agency relation may exist even though the parties do not call it an agency and do not subjectively intend that legal consequences flow from their relation. *Id.* What is critical is that the parties materially agree to enter into a particular relation to which the law attaches the legal consequences of agency, even though those consequences might not have been within the contemplation of the parties at the time of their agreement. *Id.* The existence of an agency relationship is ordinarily a question of fact, *e.g., Marron v. Helmecke,* 100 Colo. 364, 67 P.2d 1034 (1937); *Eckhardt v. Greeley Nat'l Bank,* 79 Colo. 337, 245 P. 710 (1926); *Schoelkopf v. Leonard,* 8 Colo. 159, 6 P. 209 (1884), but the court may properly decide the question as one of law when the facts are not in dispute, *Marron,* 100 Colo. 364, 67 P.2d 1034; *Smith v. Davis,* 67 Colo. 128, 186 P. 519 (1920).

Agents may be classified into two general types. A general agent is "an agent authorized to conduct a series of transactions involving a continuity of service," *Restatement (Second) of Agency* § 3(1), such as one "who is an integral part of a business organization and does not require fresh authorization for each transaction." *Id.* § 3 comment a. A special agent is defined as "an agent authorized to conduct a single transaction or series of transactions not involving continuity of service." *Id.* § 3(2). Under some circumstances, authority can be further delegated to subagents. A subagent is "a person appointed by an agent empowered to do so, to perform functions undertaken by the agent for the principal, but for whose conduct the agent agrees with the principal to be primarily responsible." *Id.* § 5(1). A

subagent is the agent of both the appointing agent and the principal. *Id.* § 5 comment d. Notice to an agent given in the course of a transaction which is within the scope of the agency is notice to the principal. *Gray v. Blake,* 131 Colo. 560, 564, 283 P.2d 1078, 1080 (1955); *Denver, S.P. & Pac. R.R. v. Conway,* 8 Colo. 1, 9, 5 P. 142, 147 (1884). So too, notice to a subagent who is under a duty to communicate the notice to the agent is effective to the same extent as if notice had been given to the agent. *Restatement (Second) of Agency* § 283(a) and comment b.

### B.

▓▓▓ In the context of residential real estate transactions, it is a widely accepted rule of agency law that a real estate broker operating under an exclusive listing contract with the seller of the property stands in an agency relationship to the seller. *E.g., Marcotte Realty & Auction, Inc. v. Schumacher,* 229 Kan. 252, 624 P.2d 420 (1981); *Vogt v. Town & Country Realty,* 194 Neb. 308, 231 N.W.2d 496 (1975); *Bartsas Realty, Inc. v. Leverton,* 82 Nev. 6, 409 P.2d 627 (1966); *Mersky v. Multiple Listing Bureau,* 73 Wash. 2d 225, 437 P.2d 897 (1968); *Myer v. Miller,* 631 P.2d 441 (Wyo. 1981). This rule has been recognized, albeit implicitly, and applied in several Colorado decisions. *See Circle T. Corp. v. Deerfield,* 166 Colo. 238, 444 P.2d 404 (1968); *Shriver v. Carter,* 651 P.2d 436 (Colo.App.1982); *Hickam v. Colorado Real Estate Comm'n,* 36 Colo.App. 76, 534 P.2d 1220 (1975). The seller-broker relationship is a special agency created and defined by the listing agreement between the parties. This agreement describes the property or interest to be sold, the price or range of prices acceptable to the seller, the broker's commission, and the length of time the

agreement is binding, and authorizes the broker to find a ready, willing, and able purchaser for the listed property on terms acceptable to the seller. D. Burke, Jr., *Law of Real Estate Brokers* § 2.3 (1982); Colo. Real Estate Comm'n, *Real Estate Manual,* ch. VIII, at 1 (1985). Because it is customary for a real estate broker to employ salespersons to deal with prospective purchasers of the listed property, the authority given to the broker by the listing agreement will generally include the implied authority to appoint these salespersons as subagents to perform the tasks assigned to the broker by the listing agreement. *Rosenthal v. Art Metal, Inc.,* 95 N.J. Super. 8, 229 A.2d 676 (1967); *Restatement (Second) of Agency* § 80.

▓▓▓ The listing agreement may authorize the broker to list the property with a multiple listing service. A multiple listing service is basically an arrangement for brokers in a given locality to pool their listings and split their commissions. *See Frisell v. Newman,* 71 Wash. 2d 520, 429 P.2d 864, 868 (1967). Brokers who are members of the multiple listing service submit their listings to a central bureau which then publishes and distributes a catalog of available properties. Under traditional agency principles, a listing contract which authorizes the listing broker to list the property with a multiple listing service permits the listing broker to create a subagency with other members of the multiple listing service.[2] As we stated in *People v. Colorado Springs Board of Realtors,* 692 P.2d 1055, 1059 (Colo.1984), the listing broker's act of listing the property with the multiple listing service "constitutes an offer of subagency by the listing broker to other [multiple listing service] members to procure a

---

2. Our analysis of the multiple listing service is consistent with the understanding of the real estate profession. Colo. Real Estate Comm'n, *Real Estate Manual,* ch. VIII, at 3, states that "[g]enerally [a multiple listing] is an exclusive right to sell listing, with the additional feature that other participating brokers may also sell the property as sub-agents of the listing broker." Since we deal in this case with an exclusive

listing agreement that expressly authorized the listing broker to list the property with a multiple listing service, it is unnecessary to address whether an exclusive listing agreement that is silent on multiple listing authorization might nonetheless result in an agency relationship between the seller and selling ("cooperating") broker or salesperson when the listing broker lists the property with a multiple listing service.

buyer in exchange for a percentage of the sale commission." [3]

We acknowledge that some courts have rejected the characterization of the relationship between the seller of a home and a broker-member of a multiple listing service as one of subagency, primarily on the basis that some aspects of the relationship do not fit the classic description of a consensual fiduciary relation involving one person acting on behalf of and subject to another's control. *E.g., Wise v. Dawson,* 353 A.2d 207 (Del.Super.1975);[4] *Pumphrey v. Quillen,* 102 Ohio App. 173, 141 N.E.2d 675 (1955). Indeed, one commentator has not only rejected the proposition that there is an agency relationship between the seller and a broker-member of a multiple listing service, but has also advanced the notion that a cooperative sale by a broker-member of a multiple listing service establishes an agency relationship between the *purchaser* and the selling broker. Comment, *A Reexamination of the Real Estate Broker-Buyer-Seller Relationship,* 18 Wayne L. Rev. 1344, 1353 (1972);[5] *see also* Gulitz, *Broker's Responsibilities in Co-op Sales: Whose Agent is He?,* 10 Real Estate L.J. 126, 129–31 (1981). The reasoning here is

that agency law should reflect the expectations of the parties and that a purchaser of real estate reasonably believes that a selling broker or salesperson is acting on behalf of and in the interest of the purchaser. While this view undoubtedly has some merit, we believe there are cogent reasons to support the traditional rule that a principal-agent relationship flows from the seller to the selling ("cooperating") broker in a multiple listing transaction.

The selling broker's role is to use his expertise and judgment in promoting the interests of the seller by finding a buyer for the property, and, to this end, the selling broker makes use of information furnished by the seller in the listing arrangement. Upon finding a purchaser for the property, the selling broker becomes entitled to collect the commission from the seller. The basic structure of this business relationship derives from the listing contract between the seller and the listing broker and the agreement between the listing broker and other members of the multiple listing service. There is no such similarly structured relationship between the

---

**3.** In some situations we have found that a selling broker has acted as agent of a purchaser. In *Hiller v. Real Estate Comm'n,* 627 P.2d 769 (Colo.1981), for example, we reversed an order suspending the license of Hiller, a real estate broker, for unworthy, incompetent, and dishonest conduct in violation of section 12–61–113(1)(n) and (1)(t), 5 C.R.S. (1973). Hiller was the listing broker for the sale of his wife's home. Both Hiller and his wife intended to purchase a home listed by another broker and to sell Hiller's condominium prior to the purchase. We determined that Hiller's conduct in connection with the prospective purchase of a home and the broker's act in signing the purchase agreement as "agent" clearly indicated that the broker was acting as agent for his wife in the transaction and not as agent of the seller. Again, in *Lester v. Marshall,* 143 Colo. 189, 352 P.2d 786 (1960), the court determined that the selling and listing broker was liable in tort to the purchasers of a home on the basis of the selling broker's failure "to carry out an express undertaking which the [purchasers] had relied on them to carry out" and "as a result of which the [purchasers] suffered a loss." These decisions were fact-specific, and we did not in either case adopt a general rule of agency between a purchaser and a selling broker or salesperson.

**4.** In concluding that the relationship between a seller and a broker-member of a multiple listing

service was not one of subagency, the Delaware Court in *Wise v. Dawson,* 353 A.2d 207 (Del.Super.1975), emphasized that the service arrangement has as its purpose the exchange of information rather than the establishment of an agency, that a split commission was not an indication of agency since it can occur between independent contractors, that the listing broker had no control over the selling broker, and that the widespread acceptance of the multiple listing service was indicative of the absence of any agency relationship between brokers.

**5.** The Wayne Law Review article states:

Reliance on agency doctrine in this situation results in a great inequity to the buyer, especially where a buyer specifically requests the broker's representation and aid in securing a home free of defects or where he specifically requests disclosure of the defects in each house shown to him. In the absence of a listing agreement between the broker and the seller, the broker should be deemed the agent of the buyer and not the subagent of the listing broker. There is no compelling reason for a court to invariably adhere to the agency doctrine that this selling broker is a subagent of the listing broker.

18 Wayne L.Rev. at 1353.

selling broker and the buyer in the typical residential real estate transaction. The buyer, for example, has no duty to the selling broker to complete his contract with the seller so as to enable the broker to collect his commission. Note, *Ellsworth Dobbs, Inc. v. Johnson: A Reexamination of the Broker-Buyer-Seller Relationship in New Jersey,* 23 Rutgers L. Rev. 83, 99–100 (1968). Furthermore, in the event the seller defaults on a real estate sales contract, the selling broker is under obligation to return to the buyer the full amount of the deposit or down payment received from the buyer. *Perino v. Jarvis,* 135 Colo. 393, 312 P.2d 108 (1957); *Victor M. Cox & Co. v. Borstadt,* 49 Colo. 83, 111 P. 64 (1910).

Also, although some of the ostensible indicia of an agency relationship may be present in situations where a real estate broker or salesperson maintains close contact with a prospective purchaser of a home, we believe that finding an agency relationship in such circumstances would lead inevitably to the creation of a dual agency between the seller and the prospective purchaser as principals and the real estate broker or salesperson as agent. Such dual agency holds out the potential for serious conflicts of interest in the typical residential real estate transaction. Under Colorado law, a real estate broker or salesperson is prohibited from representing both the seller and the buyer in *the same real estate transaction* unless the parties know of and consent to the arrangement. *Finnerty v. Fritz,* 5 Colo. 174, 175–76

(1879).[6] This same principle is codified in Colorado statutes and rules governing the real estate profession. § 12–61–113(1)(d), 5 C.R.S. (1985) (real estate broker or salesperson subject to license suspension or revocation for "[a]cting for more than one party in a transaction without the knowledge of all parties thereto"); Real Estate Comm'n Rule E–32, 4 C.C.R. 725–1, at 7.05b (licensee representing purchaser pursuant to agency contract prohibited from simultaneously representing owner or acting as subagent of licensed broker representing owner unless written disclosure is made and express written consent given by all parties; written disclosure must state that licensee is acting as agent for both purchaser and seller and must identify source and nature of compensation to be paid licensee).

Finally, the legal recognition of an agency relationship between the prospective purchaser and selling broker or salesperson, solely on the basis of the selling broker's or salesperson's contacts with the purchaser and efforts expended to find the purchaser a home, would not necessarily inure to the benefit of the purchaser. As one commentator has observed:

> With the seller-selling agent relationship established, the seller may become liable to the buyer in tort for any misrepresentations of his agent through the ratification doctrine. *See Restatement (Second) of Agency* §§ 82, 92–93, 98–100, 218 (1957). Such liability allows the remedy of rescission against the seller. If

**6.** Over 100 years ago the *Finnerty* court observed as follows:

> [I]t is a well settled rule that the same person cannot be both agent of the owner to sell, and agent of the purchaser to buy, for the reason that the interests of buyer and seller necessarily conflict, and the same agent cannot serve both employers with efficiency and fidelity. The interest of the agent conflicts with his duty in such case. His duty to the vendor to sell for the highest price is wholly incompatible with his duty to the purchaser to buy for the lowest price, and these inconsistent relations, if assumed, would expose him to the temptation to sacrifice the interests of one party or the other, in order to secure his double commissions. Wherefore, it is the established policy of the law to remove all such

temptations, and to this end, every contract whereby an agent is placed under a direct inducement to violate the confidence reposed in him by his principal, is declared to be opposed to public policy, and not capable of being enforced as against any person who has a right to object. The effect of the rule is, that if an agent act for both parties in the same transaction, he cannot recover compensation from either, unless the parties knew and assented to his acting for both. The rule cannot be avoided by proof that no injury has resulted from his double dealing, for the policy of the law is not remedial of actual wrong, but preventive of its possibility.

5 Colo. at 175–76; *see also* H. Fusilier, *The Law of Real Estate Practice* § 8.3, at 238 (1970).

there is no agency relationship between the seller and the selling broker, but the agency relationship is between the buyer and the selling broker, this remedy of rescission is no longer available to the buyer because the ratification doctrine would not be applicable, and the buyer's only recourse may be a suit against the broker for damages. In such a situation, the finding of agency between buyer and selling broker may be more harmful to the buyer than beneficial, because the buyer would lose his action for rescission and restitution against the seller. *See Restatement (Second) of Agency* §§ 82, 92–93, 98–100, 218 (1957). Furthermore, if the agent breaches his fiduciary duty to his principal, one of the remedies available to the principal is a return of compensation paid. If the selling broker is the agent of the buyer, it could be argued that the buyer did not pay any compensation to the agent, because the agent was paid by the seller through the listing broker. Again, the finding of an agency relationship between the selling broker and the buyer may not enhance the buyer's legal position.

Romero, *Theories of Real Estate Broker Liability: Arizona's Emerging Malpractice Doctrine,* 20 Ariz.L.Rev. 767, 773 n. 33 (1978).

■ The well-defined relationship that can be traced from the seller to the listing broker and then to the selling broker or salesperson leads us to conclude that in a typical multiple listing real estate transaction the selling ("cooperating") broker or salesperson functions as an agent of the listing broker and, consequently, stands in a subagency relationship to the seller. This conclusion is not only in harmony with our characterization of the relationship in *People v. Colorado Springs Board of Realtors,* 692 P.2d at 1059, where we noted that a "[multiple listing service] listing constitutes an offer of subagency by the listing broker to other [multiple listing service] members to procure a buyer in exchange for the percentage of the sale commission," but is also in substantial accord with the majority of jurisdictions which have specifically addressed the agency rela-

tionship created through a multiple listing service in a residential real estate transaction. *See, e.g., Fennell v. Ross,* 289 Ark. 374, 711 S.W.2d 793 (1986); *Vanderschoot v. Christiana,* 10 A.D.2d 188, 198 N.Y.S.2d 768 (1960); *Jackson v. Williams,* 510 S.W.2d 645 (Tex.Civ.App.1974); *Frisell v. Newman,* 71 Wash. 2d 520, 429 P.2d 864 (1967); *First Church of the Open Bible v. Cline J. Dunton Realty, Inc.,* 19 Wash. App. 275, 574 P.2d 1211 (1978); *cf. Kruse v. Miller,* 143 Cal.App.2d 656, 300 P.2d 855 (1956) (subagency between selling broker and seller found on basis of permission of listing broker rather than multiple listing agreement).

■ The listing broker's offer of subagency to other multiple listing service members is an offer for a unilateral contract—that is, an offer requesting return performance rather than a promise to perform. It is, of course, a fundamental principle of contract law that offers to enter into a contract may not be revoked after acceptance without liability for breach. 1 S. Williston, *A Treatise on the Law of Contracts* § 55 (3d ed. 1957); 1 *Corbin on Contracts* § 38 (1963). A unilateral offer is accepted when substantial performance has been rendered by the offeree. 1 *Corbin on Contracts* § 49. In the context of the multiple listing arrangement, therefore, a broker accepts the unilateral offer by making a demonstrable effort to obtain a purchaser for the property. There can be no question that the actual production of a ready, willing, and able purchaser will constitute acceptance of the subagency offer. Short of this, such acts as contacting potential purchasers about the listed property and showing the property by appointment, especially when considered in combination, can well evince the level of effort required for substantial performance. Of course, the fact that a broker accepts the offer of subagency does not preclude the same broker from acting as agent with respect to the sale of other property, including the property of a prospective purchaser. *Hale v. Wolfsen,* 276 Cal.App.2d 285, 291, 81 Cal.Rptr. 23, 27 (1969).

Once created, the subagency relationship continues until terminated by the expiration of time, the expiration of the listing agreement, the sale of the listed property, the withdrawal of consent by either the listing broker or the seller, or other circumstances which indicate that the principal no longer wishes the subagent to act in accordance with the initial authorization. *See generally Restatement (Second) of Agency* §§ 105–07, 117–19. A principal's revocation of agency authority terminates only upon notice to the agent. *Lowell v. Hessey*, 46 Colo. 517, 105 P. 870 (1909); *see also Restatement (Second) of Agency* § 118.

## C.

Our determination that the selling broker or salesperson acts as a subagent of the seller is not intended to preclude a real estate broker and a prospective purchaser from entering into a written agreement designating the broker as the purchaser's agent for the purpose of locating and purchasing property. However, while general agency principles permit the establishment of an agency relationship through the conduct of the principal and agent, *Guy Martin Buick, Inc. v. Colorado Springs Nat'l Bank*, 184 Colo. 166, 519 P.2d 354 (1974); *Rhodes v. Industrial Comm'n*, 99 Colo. 271, 61 P.2d 1035 (1936), such an agency relationship cannot arise by implication between a purchaser and a real estate broker or salesperson in the inherently ambiguous circumstances of a residential sale. The prevailing perception of the broker as an agent of the seller is too firmly imbedded in the real estate business to permit such a finding on the basis of conduct alone. Furthermore, as previously noted, Colorado law prohibits a real estate broker or salesperson from simultaneously representing both the seller and the purchaser in the same transaction unless written disclosure of such dual representation is given to the seller and purchaser and they consent in writing to the dual agency arrangement. § 12–61–113(1)(d), 5 C.R.S. (1985); Real Estate Comm'n Rule E–32, 4 C.C.R. 725–1, at 7.05b; Colo. Real Estate Comm'n, *Real Estate Manual*, ch. VIII, at 4.

Since the multiple listing service is a fact of life in modern real estate practice, and since a real estate broker or salesperson operating within a multiple listing service is clearly in a chain of agency to the seller and is prohibited from representing both parties to a real estate sale unless there is a written disclosure of a dual agency and written consent of the parties, we conclude that a real estate broker or salesperson who wishes to act as the agent of a prospective purchaser in connection with the purchase of a home must establish that agency by a written agreement with the purchaser. Written documentation of the agency relationship under these circumstances not only will serve to obviate any uncertainty on the part of the prospective purchaser regarding the authority of the broker or salesperson to act on the purchaser's behalf in connection with the details of a contemplated purchase but should also remove all doubt on the part of the broker or salesperson as to their fiduciary obligation to act with loyalty and candor in their relationship with the purchaser. In the absence of any such written agreement we will consider a selling broker or salesperson only as an agent of the listing broker and subagent of the seller. When there is a written agency agreement between the broker or salesperson and the prospective purchaser, then obviously the terms of the agreement, rather than the multiple listing arrangement, determine the rights and duties of the parties with respect to the agency relationship.

The absence of an agency relationship between the purchaser and the selling broker does not leave the purchaser unprotected in his dealings with the selling broker or salesperson. A selling broker or salesperson may be held liable for wrongful acts causing damage to a third person. This principle is recognized in both the statutory and decisional law of this state. In order to protect the public from unscrupulous brokers, the legislature has extensively regulated the real estate profession, §§ 12–61–101 to –407, 5 C.R.S. (1985 & 1986 Supp.), and licensed brokers and salespersons are subject to sanctions for various

forms of unethical and unprofessional conduct, § 12–61–113, 5 C.R.S. (1985 & 1986 Supp.).[7] Moreover, Colorado courts have consistently held a licensed broker or salesperson accountable where the licensee failed to deal fairly and honestly with the purchaser, *see, e.g., Lear v. Bawden,* 75 Colo. 385, 225 P. 831 (1924); *Fitzgerald v. Edelen,* 623 P.2d 418 (Colo.App.1980), as have the courts of other states. *See, e.g., Bevins v. Ballard,* 655 P.2d 757 (Alaska 1982) (a duty to purchaser can arise when broker becomes aware of suspicious facts regarding his representation or when a purchaser makes an affirmative inquiry and broker fails to check the accuracy of his representation); *Hagar v. Mobley,* 638 P.2d 127 (Wyo.1981) (broker liable to purchasers for misrepresenting material terms of lease in connection with sale of leasehold interest); *see generally* Note, *A Real Estate Broker's Duty to His Purchaser: Washington State's Position and Some Projections For the Future,* 17 Gonzaga L.Rev. 79 (1981). These obligations exist and are accordingly enforceable notwithstanding the absence of an agency relationship between the purchaser and the selling broker or salesperson.

## III.

The remaining aspect of this case concerns the application of the aforementioned guidelines to the undisputed facts. We are dealing here with a summary judgment based on a written stipulation of fact and several documents relating to the purported purchase of the Quay Court property by the Stortroens. No one is claiming that a trier of fact, notwithstanding the undisputed facts, might nonetheless draw conflicting factual inferences on critical elements of a claim or defense. On the contrary, what the parties are contesting here are the legal principles that should be applied to the uncontroverted evidence. Under these circumstances we may appropriately apply those principles to the facts and enter the requisite legal conclusions in resolving this controversy. *See, e.g., Jones v. Dressel,* 623 P.2d 370 (Colo.1981); *Stagecoach Property Owners Ass'n v. Young's Ranch,* 658 P.2d 1378 (Colo.App.1982).

■ The stipulated facts demonstrate that the Stortroens, who wished to sell their home and to purchase a new home in the Denver metropolitan area, sought the assistance of Mary Panio, a broker-associate at Foremost Realty, who had previously assisted them in locating their current home. Panio consulted the multiple listing service published by Metrolist and discovered in the multiple listing Beneficial's Quay Court property which was listed under Olthoff Realty Company's listing contract with Beneficial. By consulting the multiple listing service, Panio thus became aware of Olthoff Realty Company's unilateral offer of subagency to all members of the multiple listing service, including Panio, to produce a buyer of the Beneficial property in exchange for a percentage of the sale commission. This offer of subagency was expressly authorized by the terms of Beneficial's exclusive listing contract with Olthoff Realty Company. Panio's efforts in showing the home to the Stortroens, assisting them in preparing an offer, and facilitating communication between the Stortroens and Beneficial clearly rose to the level of substantial performance sufficient to constitute Panio's acceptance of the subagency offer extended by Olthoff Realty Company.

The agency relationship flowing to Olthoff Realty Company and through the company to Beneficial is not affected by the fact that the Stortroens had listed their

---

**7.** The license of a broker or salesperson may be temporarily suspended or permanently revoked for such acts as making substantial or repeated misrepresentations or false promises, acting as a dual agent without the knowledge and consent of the parties, or failing to account for or remit monies which belong to others. § 12–61–113, 5 C.R.S. (1985 & 1986 Supp.). A person who obtains a final judgment against a licensed broker or salesperson on the grounds of negligence, fraud, willful misrepresentation, deceit, or conversion of funds, arising from a real estate transaction, may apply to the real estate recovery fund, which is financed by license fees and operated by the Real Estate Commission, for payment of the unpaid actual and direct loss in the transaction, including court costs and reasonable attorney fees. *See* §§ 12–61–301 to –305, 5 C.R.S. (1985 & 1986 Supp.).

current home in Denver for sale with Foremost Realty on November 4, 1983. The listing agreement executed by the Stortroens and Foremost Realty created a special agency for a single transaction, the sale of their home. *See Restatement (Second) of Agency* § 3. There is no legal impediment to a listing broker's simultaneous entry into special agency relationships with more than one seller. Since the scope of the listing broker's agency is limited by the listing contract, a selling broker's authority would likewise be limited to matters affecting the sale of the real property described in the listing agreement. Thus, although Panio may have been a special agent to the Stortroens for the sale of their home, she was also a special agent to Olthoff Realty Company by virtue of the multiple listing service and was a subagent to Beneficial for the sale of the Quay Court property.[8]

■ Beneficial's counterproposal delivered to Panio for submission to the Stortroens expressly stated that acceptance should be by signature on the face of the instrument and that the counterproposal would become a binding contract if notice of the acceptance was received by the seller on or before 9 P.M. on February 3, 1984. Panio, in accordance with the instructions from her principal, made arrangements with the Stortroens to discuss the counterproposal at their home. Although Olthoff Realty Company attempted to terminate the agency relationship before Panio kept that appointment, the revocation was not effective, since a principal's revocation of agency authority terminates only upon notice to the agent. *E.g., Lowell v. Hessey,* 46 Colo. at 521, 105 P. at 871. When Panio received notice of the Stortroens' signed acceptance of Beneficial's counterproposal,

therefore, she was acting as an agent of the listing broker, Olthoff Realty Company, and a subagent of the seller, Beneficial. The notice given to Panio of the Stortroens' acceptance must be imputed to the listing broker and the seller. *E.g., Gray v. Blake,* 131 Colo. at 564, 283 P.2d at 1080; *Restatement (Second) of Agency* § 283(a) and comment b.

The Stortroens' acceptance of Beneficial's counterproposal clearly took place before Beneficial's attempted revocation of that counteroffer. Just as the Olthoff Realty Company's attempted revocation of Panio's agency authority was ineffective due to the lack of notice to Panio, Beneficial's revocation of the counteroffer was not effective because it was never communicated to the Stortroens before their acceptance. *See* 1 *Corbin on Contracts* § 39. When the Stortroens presented Panio with the signed and accepted counterproposal, therefore, a binding contract was formed between the Stortroens and Beneficial for the purchase of the Quay Court property.[9]

The district court incorrectly entered summary judgment in favor of Beneficial, and erred in not granting the Stortroens' motion for summary judgment. Because the court erroneously entered summary judgment in favor of Beneficial, it never considered the propriety of a specific performance decree in favor of the Stortroens and the other relief requested by them in their complaint. These matters should be addressed by the district court upon remand of the case.

The judgment is reversed and the cause is remanded for further proceedings not inconsistent with the views herein expressed.

ERICKSON, J., specially concurs.

---

8. While homeowners who wish their listing broker to represent them for the purpose of acquiring property may enter into an agency agreement to that effect, there is nothing in the record to indicate that the Stortroens entered into such an agreement with Foremost Realty or Panio. The agency relationship between the Stortroens and Foremost Realty, including its broker-associate Panio, was solely with respect to the sale of the Stortroens' current home.

9. The Stortroens' acceptance of Beneficial's counterproposal gave the Stortroens an option to purchase the Quay Court property on the terms of the counterproposal within 72 hours of the acceptance. The 72-hour option could not be withdrawn before its expiration. *Tallman v. Smith,* 112 Colo. 217, 148 P.2d 581 (1944). The Stortroens expressly waived the contingency clause in the counterproposal relating to the sale of their current home, thus effectuating a binding contract with Beneficial.

ERICKSON, Justice, specially concurring in the result:

I agree with the majority that the subagency created by the multiple listing service in this case caused the counterproposal to ripen into an enforceable contract when it was signed by the Stortroens and delivered to Mary Panio, the subagent. *People v. Colorado Springs Board of Realtors, Inc.*, 692 P.2d 1055, 1059 (Colo.1984). I write separately because the result reached by the majority can be supported not only because Mary Panio was a subagent of the broker representing Beneficial Finance Co. of Colorado (Beneficial), but also because the Stortroens' acceptance of the contract was effective when it was signed and put out of their possession.

Beneficial's counteroffer stated: "If this counterproposal is accepted by Purchaser, as evidenced by Purchaser's signature hereon, and if Seller receives notice of such acceptance on or before 9 P.M. 2-3-84, 1984, the said proposed contract, as amended hereby, shall become a contract between the parties." The acceptance provision formulated by Beneficial is ambiguous at best because the formation of a contract between the Stortroens and Beneficial depended not only upon the signature by the Stortroens, but also upon the delivery of notice of acceptance to Beneficial "on or before 9:00 P.M. 2/3/84, 1984." In my view, the delivery requirement imposed a further condition on the validity of the acceptance, but did not prevent the acceptance from becoming effective when the counteroffer was signed and given to Panio for delivery to Beneficial.

Under general principles of contract law, "it is essential to an acceptance by promise either that the offeree exercise reasonable diligence to notify the offeror of acceptance or that the offeror receive the acceptance seasonably." Restatement (Second) of Contracts § 56 (1979). However, if the offeree exercised reasonable diligence to notify the offeror, or if the offeror received the acceptance seasonably, the acceptance is operative *"as soon as [it is] put out of the offeree's possession,* without regard to whether it ever reached the offeror...." Restatement (Second) of Contracts § 63 (1979) (emphasis added).

It is undisputed that the Stortroens signed the counterproposal and immediately gave it to Panio with directions to deliver it to Beneficial. Because the acceptance was effective at the time the counterproposal was put out of the Stortroens' possession, Beneficial's later revocation was ineffective. *See* Restatement (Second) of Contracts §§ 68, 42 (1979). The Stortroens' decision to use Panio as an intermediary for delivery of the contract was reasonable, as it was the method chosen by Beneficial to communicate the counterproposal or offer to the Stortroens. *See* Restatement (Second) of Contracts § 65 (1979).

The ambiguous acceptance provision of the counterproposal does not alter the result under accepted principles of contract law. When the terms of a contract are ambiguous, they must be strictly construed against the party drafting the contract. *Greenshoe Manufacturing Co. v. Farber,* 712 P.2d 1014, 1016 (Colo.1986). Construing the provision strictly against Beneficial, as we must, the notification requirement merely imposes a further condition on the *validity* of the Stortroens' acceptance, and does not extend the time at which the acceptance was effective. The parties stipulated that the Stortroens complied with all conditions of acceptance set forth in the counterproposal, and the acceptance therefore was valid and effective at the time it was given to Panio.